1          IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

2

_____

3

UNITED STATES OF AMERICA

4
               Plaintiff

5
     vs.          Criminal Action No. 04-51E

6
GARY DEAN RHOADES

7
               Defendant

8  _____

9
               PROCEEDINGS

10
          Transcript of Sentence commencing on Tuesday,

11   June 21, 2005, United States District Court, Erie,
     Pennsylvania, before Honorable Maurice B. Cohill, Jr.,

12   District Judge.

13  APPEARANCES:

14  For the Government:        US Attorney's Office
                    By:  Marshall Piccinini, Esq.

15
     For the Defendant:        Federal Public Defender

16                    By:  Thomas Patton, Esq.

17               Reported by:
                 Michael D. Powers

18                Official Court Reporter
                 1015A USPO & Courthouse

19                Pittsburgh, Pennsylvania 15219
                 (412) 765-3419

20

21

22  Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
23

24

25


                              2


1                I N D E X

2  GOVERNMENT WITNESS    DIRECT  CROSS  REDIRECT  RECROSS

3  KELLY SMITH

4    By Mr. Piccinini    6
      By Mr. Patton              37
5

6  DEFENDANT WITNESS    DIRECT  CROSS  REDIRECT  RECROSS

7  MICHAEL P. ROLLAGE

8    By Mr. Patton      54            79
      By Mr. Piccinini          70
9
    ARGUMENT
10
    DEFENDANT  - PAGE 82
11
    GOVERNMENT - PAGE 89
12
    COURT'S RULING AND SENTENCE - PAGE 92
13

14

15

16

17

18

19

20

21

22

23

24

25

3

1           P R O C E E D I N G S

2   (Court reconvened on Tuesday, June 21, 2005, at 9:35 a.m.)

3           THE COURT:  Good morning.

4           MR. PICCININI:  Good morning, Your Honor.

5           MR. PATTON:  Good morning, Your Honor.

6           THE COURT:  Be seated, please.

7           This is the time set for the sentencing of

8   Gary Dean Rhoades.  And we note that Mr. Rhoades and

9   Mr. Patton, his attorney, have signed the notice indicating

10   they have received and reviewed the presentence report.

11          We will make that part of the record and keep it

12   under seal.  If an appeal should be taken, of course, counsel

13   on appeal would be permitted access to that report.

14          There has been no information withheld from the

15   defendant which was given to the Court.

16          I assume defense counsel received the impact

17   statement from the Venango County Commissioners that was

18   given to the Court?

19          MR. PATTON:  We received the addendum to the report

20   which laid out the impact statement, and I believe we did

21   actually receive a copy of the impact statement, itself, as

22   well.

23          THE COURT:  Okay.  In wake of the recent decision

24   by the United States Supreme Court in United States against

25   Booker, 125 Supreme Court 738 issued in the year 2005, the

4

1   Sentencing Guidelines, of course, now are advisory only.

2   But, we are still obligated to consult them in determining

3   imposition of a reasonable sentence.

4          Therefore, it's necessary that the Court will

5    address the objections to the presentence report and resolve

6    any factual disputes regarding the guidelines on the record

7    just as we did before.  But, we do have to consider the

8    guideline range in order to receive the advice, so to speak,

9    of those guidelines, or I guess I should say the guidance of

10   those guidelines.

11          And in addition to the Booker decision, after

12   calculating the applicable guideline range, we must consider

13   the factors set forth in 18 United States Code

14   Section 3553(a).

15          The government did not have any objections to the

16   presentence report.

17          The defendant has filed a position with respect to

18   the sentencing factors raising several objections.

19          So, Mr. Patton, we'll ask you at this time if you

20   would give us your position and then we'll hear from the

21   government.

22          MR. PATTON:  Your Honor, the only objection that we

23   have that substantively affects the guideline calculation is

24   the issue as to whether or not the abuse of position of trust

25   enhancement should apply.

1          There were also some clarifications in some of the

2   family history information that was in the presentence

3   report.  But, I believe the addendum acknowledges those

4   corrections and that has been addressed.  So, I believe all

5   we are left with today is the issue of abuse of position of

6   trust.

7          I have spoken with Mr. Piccinini about how we will

8   proceed today.  Since the abuse of position of trust is an

9   enhancement in Mr. Rhoades' offense level, the government

10  does have the burden of proof of establishing the abuse of

11  position of trust enhancement applies.

12          And Mr. Piccinini has evidence that he wishes to

13  present on that issue and I then have evidence that I wish to

14  present.

15          THE COURT:  Okay.  We will proceed in that fashion.

16          MR. PICCININI:  Thank you, Your Honor.

17          In addition to our witness testifying concerning

18  that issue, rather than call him twice, he will also go into

19  some other matters concerning the facts of the case that I

20  think are relevant for sentencing, and counsel agreed with

21  that as well.

22      Your Honor, at this time I would call Special Agent

23  Kelly Smith from the FBI.

24      THE COURT:  Come forward and be sworn, please.

25      Would you stand and be sworn, please?


                    Smith - Direct                6


1           * * * * *

2       KELLY SMITH, having first been duly sworn, testified

3   as follows:

4       THE COURT:  Would you have a seat, please, and give

5   us your name and spell your last name.

6       THE WITNESS:  Kelly Smith, Special Agent with the

7   FBI.  It's S-m-i-t-h.

8       THE COURT:  First name is K-e-l-l-y?

9       THE WITNESS:  That's correct.

10      THE COURT:  Okay.

11      MR. PICCININI:  Thank you, Your Honor.

12              DIRECT EXAMINATION

13  BY MR. PICCININI:

14  Q.  Sir, how are you employed?

15  A.  I'm employed as a Special Agent of the Federal Bureau of

16  Investigation.

17  Q.  And how long have you been employed in that capacity?

18  A.  Approximately three and a half years.

19  Q.  In the three and a half years that you have been

20  assigned to the Erie FBI office, has there been a primary

21  focus in your investigative activity within the Erie office?

22  A.  Yeah.  The primary focus of my responsibilities include

23  the enforcement of what we typically call white-collar crimes

24  and federal law affiliated with that.

25  Q.  And, Special Agent Smith, do you have a background that

Smith - Direct                7

1  would give you some reason why your agency has assigned you

2  to conduct these types of investigations?

3  A.  Yes.  Prior to my employment with the FBI, I was

4  employed as a certified public accountant with an

5  international accounting firm.

6  Q.  And where were you employed with that accounting firm?

7  A.  In Seattle, Washington.

8  Q.  And what was the nature of your employment with that

9   accounting firm?

10  A.  I was actually an auditor and typically I conducted

11  financial statement audits.  Different accountants in the

12  firm had different responsibilities.  Some were responsible

13  for taxes.  And my responsibilities mainly included financial

14  statement audits.

15  Q.  And for what period of time did you conduct financial

16  statement audits for this international accounting firm?

17  A.  Approximately September of 1997 to January of 2002.

18  Q.  Now, were you also the case agent in the Gary Rhoades'

19  investigation?

20  A.  Yes, I was.

21  Q.  Before we get into some of the details, if you can just

22  explain generally, for the record, the nature of this scheme

23  that Mr. Rhoades engaged in and whether it is similar to

24  other schemes that have been seen across the nation?

25  A.  Yes.  The scheme that Mr. Rhoades used was what is

                    Smith - Direct              8

1   typically known as a ponzi scheme.  The person perpetrating

2   the scheme will generally solicit funds from investors and

3   then use those funds to solicit additional investors and use

4   the later investor's investments to pay off the investment to

5   the previous investors.

6          Essentially, instead of actually making some sort

7   of return on the investment, they are using principal

8   investments from later victims to pay off the earlier

9   victims.  And eventually, as in this case, most of the

10  schemes begin to fall apart when they are unable to solicit

11  additional investors to pay off the original victims.

12  Q.   In a nutshell, you are taking money from investors and

13  you use that same money to pay what appears to be principal

14  or interest to other investors to make them happy, to make it

15  appear that the investment is successful?

16  A.   That's correct.

17  Q.   In fact, is there any investment or any purchases of,

18  like in this case, certificates of deposit to support the

19  payments to other future investors?

20  A.   In most ponzi schemes, there is not.  And in this case,

21  there was not either.

22  Q.   With regard to our two victims, the Northwestern School

23  District and Venango County, at least the two victims

24  identified in this particular indictment, was this a matter

25  of Mr. Rhoades funneling some of the Venango County money to

Smith - Direct                9

1   Northwestern School District and some of Northwestern School

2   District money back to Venango County to make it appear that

3   investments had been made for that?

4   A.   Yes.  During the period of this scheme, Mr. Rhoades

5   actually commingled all the funds.  Once he received funds

6   from the investors, they were all grouped together.  And then

7   he used that same pool of funds to pay out interest and

8   principal payments to Venango County, to Northwestern School

9   District, to make it appear that their investments were

10  maturing, were coming through and were making -- the dates of

11  those interest and principal payments were on the dates that

12  the supposed investments were due to mature.

13  Q.   As far as setting up this particular scheme, were there

14  custodial agreements that were maintained between Mr. Rhoades

15  and a bank in Johnstown and -- between his victims, himself,

16  and a bank in Johnstown?

17  A.   Yes, there were three custodial agreements.  One between

18  Mr. Rhoades and the bank in Johnstown and Ameriserve

19  Financial Services, previously known as USBANCORP,

20  B-a-n-C-o-r-p, and then there was also the agreements between

21  Mr. Rhoades, the school district and the bank, and

22  agreements -- or an agreement between Mr. Rhoades, Venango

23  County and the bank.

24  Q.  Let me produce those particular agreements just so that

25  they are entered into evidence in support of the sentencing

                    Smith - Direct            10

1  today.

2        First, I have marked as Government Exhibit 1 the

3  Custodial Agreement between Gary Rhoades as the

4  representative of RCM.  What did RCM stand for?

5  A.  RCM stood for Rhoades Capital Management.

6  Q.  And this Government Exhibit 1, does this purport to be

7  the custodial agreement between Gary Rhoades and USBANCORP?

8  A.  Yes.  This is the Custodial Agreement between

9  Mr. Rhoades and USBANCORP, and I believe we obtained that

10  from USBANCORP through a grand jury subpoena.

11  Q.  And the nature of this custodial agreement between

12  Mr. Rhoades and Ameriserve, or USBANCORP, who was supposed to

13  be the custodian and who was the principal for purposes of

14  this agreement?

15  A.  The custodian was USBANCORP, which later became

16  Ameriserve, and the principal was Mr. Rhoades.  And

17  Mr. Rhoades' responsibility, he was given the authority to

18  direct the investments, transfers transactions on behalf of

19  the county and the school district, and he was the one who

20  was to contact Ameriserve Financial and direct those

21  investments or those activities.

22  Q.  So, Mr. Rhoades was the principal.

23      It was Mr. Rhoades that Ameriserve was acting as

24  the custodian on and as far as the terms of this first

25  agreement?

                    Smith - Direct              11

1  A.  That's correct.

2  Q.  And then, in addition, after having established his

3  custodial agreement with Ameriserve, did Mr. Rhoades then

4  take steps, likely at the direction of Ameriserve, to

5  establish custodial agreements for Venango County?

6  A.  Yes, Mr. Rhoades entered into custodial agreements with

7  Venango County in much the same fashion where he was to act

8  as their principal or their agent.

9  Q.  I will show you what I have marked as Government

10  Exhibit 2 for identification.

11        Does this appear to be the custodial agreement, at

12  least this custodial agreement entered into between Venango

13  County and Ameriserve?

14  A.  Yes, it does.  And this, again, was also obtained from

15  Ameriserve through grand jury subpoena.

16  Q.  And in this particular custodial agreement, the

17  principal of this agreement is, in fact, Venango County, or

18  were they referred to as the investor for purposes of this

19  agreement?

20  A.  Yeah.  I mean, they are referred to as an investor, but

21  the same term would apply.  You could use principal.

22  Q.  And with regard to Mr. Rhoades' role now with regard to

23  his victims in this custodial agreement with Ameriserve, was

24  Mr. Rhoades the agent for the investor?

25  A.  Yes.  I mean, this one, it spells out clearly that

                    Smith - Direct              12


1  Mr. Rhoades was, or RCM, Rhoades Capital Management, was the

2  agent of the investor and they were not aware of any other

3   employees of RCM other than Mr. Rhoades.

4   Q.   So, this agreement number one, Mr. Rhoades is the

5   principal for -- with Ameriserve as his custodian under RCM,

6   in agreements number two and three, Venango County and

7   Northwestern, Mr. Rhoades is the exclusive agent for the

8   county and Northwestern School District for the purpose of

9   being able to invest their funds?

10   A.   That's correct.

11   Q.   I will show you what I have marked as Government

12   Exhibit 3 for identification, which purports to be the

13   custodial agreement for Northwestern School District.

14        And is the custodial agreement for Northwestern and

15   Venango County, are they both similar agreements as far as

16   their terms, just one applies to Venango County and one

17   applies to Northwestern School District?

18   A.   That's correct.  And on appearance, I believe these are

19   both documents originally drafted by USBANCORP.  It's

20   probably a template document, if you will, and the wording,

21   the funds are a little bit different and maybe they evolved

22   over time but the wording is almost identical.

23   Q.   In effect, by establishing both the custodial agreement

24   with USBANCORP and separate custodial agreements as the agent

25  for Venango County and Northwestern School District, did

Smith - Direct                13

1  Mr. Rhoades have full authority over the funds into which are

2  placed, or the funds from which are placed into the

3  Ameriserve bank accounts?

4  A.  Yes, he had full discretion over those funds and was

5  able to direct them in any way he saw fit.

6  Q.  And that is because he had established himself as the

7  agent of the investor of the victims in this case?

8  A.  That's correct.  And presented himself as such to the

9  bank along with signatures of authority from the school

10  district and county authorizing him to act on their behalf.

11  Q.  So, day one of this particular scheme, Mr. Rhoades is

12  set up through Ameriserve and the principal with them and as

13  the agent for the investors, Northwestern School District and

14  Venango County?

15  A.  That's correct.

16  Q.  Now, in the course of your investigation, did you

17  discover whether Mr. Rhoades had established any particular

18  history, in particular, with Venango County, as an investment

19  advisor?

20  A.  Yes.  As early as 1989, Mr. Rhoades had apparently

21  assisted the county in some capacity with the issuance of a

22  bond.  One of the former county treasurers believed that he

23  was employed by Mellon Bank at the time.  It was somehow

24  related to them -- we actually obtained documents from the

25  county that showed that Mr. Rhoades was involved in this bond

                    Smith - Direct              14

1  issuance, but he was actually an employee of First Irwin --

2  or Irwin Union Trust Bank and, you know, that was the

3  earliest relationship with the county that we could document.

4  Q.  Special Agent Smith, I am going to show you what I have

5  marked as Government Exhibit 3 for identification.

6       Can you identify Government's 3?

7  A.  Yes.  This is the document I referred to, and the front

8  page is a letter from Mellon Bank to the former Venango

9  County treasurer, Margaret Spence.

10  Q.  And in the caption, the actual -- the title of this

11  particular letter and in the regard section, does it say on

12  there $4,240,000 certificates of deposit?

13  A.  Yes, it does.

14          THE COURT:  Excuse me.  You referred to that as

15   Government Exhibit 3.

16          MR. PICCININI:  Excuse me.  Four, Your Honor.  That

17   should be four.

18          THE WITNESS:  Do you want me to change it?

19          MR. PICCININI:  Yes, if you would.

20   Q.   And here in Government Exhibit 4, is this a letter to

21   the Venango County treasurer where Mr. Rhoades is

22   specifically named?

23   A.   Yes.  This is a letter to the former treasurer, and

24   attached were some agreements that the treasurer was to sign

25   and return a copy to Mr. Rhoades, who was then the vice

                    Smith - Direct              15

1    president and manager of Irwin Union Capital Corporation.

2    Q.   And here, all the way back in 1989, had Mr. Rhoades

3    established himself with Venango County as someone to whom

4    the county should turn for the investment of certificates of

5    deposit?

6    A.   That's correct.

7    Q.   And in addition to the Assistant Vice President of the

8   Public Finance Division of Mellon Bank referring to

9   Mr. Rhoades as the vice president of Irwin Union Capital for

10  purposes of investments, on page three of this document, does

11  Mr. Rhoades, in fact, sign as the vice president of Irwin

12  Bank & Trust Company?

13  A.   Yes, he does.

14  Q.   The specific dispatching instructions for purposes of

15  Venango County investing with him with Mellon Bank?

16  A.   Yes, he does.

17  Q.   And then as a follow up to the Mellon Bank and the

18  documents that were provided on July 10th, 1989, does

19  Mr. Rhoades, in fact, sign off on documentation concerning

20  his role as vice president and manager of New York Operations

21  for Irwin Union Capital Corporation?

22  A.   Yes.

23  Q.   To Mellon Bank?

24  A.   Yeah.  Mr. Rhoades wrote a letter to Mellon Bank signing

25  off as vice president and manager of Irwin Union Bank &

                    Smith - Direct              16

1   Trust, and in the letter he actually guarantees -- it's a

2   guarantee of the credit quality of an FDIC or FSLIC

3   institution, that his bank's policy is actually to guarantee

4   that investment were that institution taken over for some

5   reason.

6   Q.   So, back in 1989 Mr. Rhoades is assuring, through Mellon

7   Bank in documentation that makes its way to Venango County,

8   that if things that we invest in those banks go under, we

9   guarantee your investments?

10  A.   That's correct.

11  Q.   Now, after the 1989 time period where Mr. Rhoades

12  established a relationship, an investment relationship with

13  Venango County, did there come a point in time where members

14  of the county and the school district believed that

15  Mr. Rhoades had also been employed in the Finance Department

16  of the City of Erie?

17  A.   Yes.  It was apparent that Mr. Rhoades had been employed

18  at some point with the Erie County Finance Department, and I

19  believe there was some people, and I can't recall who, but

20  some people recalled that he was actually the Erie County

21  finance director at one time.

22  Q.   And with regard to meeting with Mr. Rhoades for purposes

23  of future investments, was there a belief that Mr. Rhoades

24  was actually president of the Commonwealth of Pennsylvania

25  County Treasurer's Association Conference?

Smith - Direct                    17

1  A.   Yeah.  The former Venango County Treasurer, Miss

2  Margaret Spence, actually believed that at one point

3  Mr. Rhoades was a guest interpreter at the Commonwealth of

4  Pennsylvania County Treasurer's Association Conference.

5  Q.   After this Mellon Bank in Irwin Company Trust

6  relationship that he had established with Venango County, did

7  the members of Venango County and Northwestern School

8  District become aware of the fact that Mr. Rhoades went out

9  on his own, hung a shingle and became Rhoades Capital

10  Management as the president of that particular investment

11  company?

12  A.   Yes, they were aware of that.  And at one point, members

13  of the school district actually believed that he may have had

14  some relationship with an entity called Cadre, C-a-d-r-e, and

15  was some sort of entity that administered what was called the

16  Pennsylvania Liquid Asset Funds, essentially a money market

17  fund for school districts.

18        Later on, they found that that was not the case.

19  But, at one point they believed that Mr. Rhoades had some

20  association with this company.

21  Q.  So, that's the background of their knowledge and

22  information concerning Gary Rhoades.

23       After having established these custodial agreements

24  between his victims and Ameriserve, what steps did

25  Mr. Rhoades take at Ameriserve to establish accounts in the

                    Smith - Direct              18

1  names of his victims?

2  A.  Mr. Rhoades approached Ameriserve and actually opened

3  two separate accounts, one for Venango County and one for

4  Northwestern School District, to receive their -- what

5  investment funds, if you will.

6  Q.  Who opened these accounts?  Was it the Venango County

7  treasurer or the Northwestern School District finance

8  director who went down to Johnstown and opened up bank

9  accounts in their names?

10  A.  No.  These accounts were opened by Mr. Rhoades.

11  Q.  And because Mr. Rhoades had established those custodial

12  agreements, did he have the authority to open up accounts in

13   the names of his clients or victims?

14   A.   As far as it pertains to Ameriserve, or then USBANCORP,

15   yes, he did.

16   Q.   Now, in addition to having opened up accounts in the

17   names of Venango County and Northwestern School District, had

18   Mr. Rhoades had other established accounts which are numbered

19   with an R at the beginning of them, but numbered accounts

20   which he controlled through which money could be funneled?

21   A.   Yes.  Mr. Rhoades actually had numerous accounts, some

22   in the names of -- some that were for his use only.  One

23   called the production account.  One called the pool account.

24        But, he also had additional accounts for different

25   quasi or actual governmental entities that he had established

                    Smith - Direct              19

1   in the past.

2   Q.   Now, by having the custodial agreements in place and the

3   accounts that he established in place, what was the nature of

4   the way in which Mr. Rhoades was able to get money into those

5   accounts which he ended up stealing?

6   A.   Well, Mr. Rhoades would solicit the investments from the

7   county and the school district, and when he did that he would

8  quote rates and maturity dates for certain certificates of

9  deposit.  And those, after we analyzed the computer, it is

10  apparent that he went to websites that would actually list

11  rates for certificates of deposit and he would actually quote

12  what looked to be real CD's that were offered.

13        And once the county or the school district decided

14  on what they wanted to invest in, he instructed them to wire

15  money to the accounts at Ameriserve, and specifically he

16  would instruct the county to wire money to the account the

17  that was under the name of Venango County.  And for the

18  school district, he would instruct them to wire money to the

19  account under the name of the school district, and that's how

20  he would receive the funds.

21  Q.  So, Mr. Rhoades would tell the victims, hey, I got these

22  CD's, these are legitimate banks, here are the percentages

23  for those, if you want those, wire transfer funds into those

24  accounts that I have established in your names?

25  A.  That's correct.  And he would also provide the FDIC

Smith - Direct                20

1  number for the banks offering the CD's.

2   Q.   Now, after having received the money wire transferred

3   into those accounts that he established, what would then

4   happen with the money in a very short timeframe?

5   A.   Within a very short time period, usually the same day or

6   within the next day, Mr. Rhoades would actually transfer the

7   money out of the accounts held in the names of the victims.

8   So, either Venango County or Northwestern School District, he

9   would transfer those funds into the account that was called

10  the pool account which was strictly for Mr. Rhoades' use.

11  Q.   And after having transferred the funds from the accounts

12  that he established for Northwestern and Venango County, what

13  would Mr. Rhoades do to let the victims know what happened

14  with their money after it was transferred out of the

15  accounts?

16  A.   Mr. Rhoades would send an investment confirmation to his

17  victims detailing each CD, each financial institution named,

18  each -- their FDIC numbers, the investment date, the maturity

19  date, the rate of return, and those would be either faxed or

20  mailed to the victims.

21  Q.   I am going to show you what I have marked as Government

22  Exhibit 5 for identification.

23        Can you identify Government Exhibit 5?

24   A.   Yes.  This would be one of the confirmations that

25   Mr. Rhoades sent.  This particular one was sent to

Smith - Direct                    21

1   Northwestern School District based on their investment of

2   November 25th, 1997, maturing June 15th of 1998.  And this

3   was representative of each time that either the county or the

4   school district made an investment, Mr. Rhoades would send

5   them this confirmation.

6   Q.   So, if the victims have a bank account in Ameriserve,

7   did Ameriserve send them bank account statements which would

8   show money came into their accounts and money was transferred

9   out of their accounts?

10   A.   That's correct.  The victims, both the county and school

11   district, received statements from Ameriserve, and those

12   statements would show the receipt of money and then the

13   almost immediate disbursement of funds out of the account.

14   Now that the school district or the county did not receive

15   statements other than their own particular accounts so they

16   didn't see that the money went to the pool account or any

17   other entity, they just saw it left their own account.

18  Q.  But, after that bank account statement was saying to

19  them, saying that $495,000 had been wired out of their

20  account, did they then receive from Mr. Rhoades something

21  similar to Government Exhibit 5, this document, showing that

22  he had invested $495,000 in the CD's?

23  A.  That's correct, they received this document.

24  Q.  Does this provide the Court a good example of how

25  specific Mr. Rhoades was on his letterhead in naming

Smith - Direct                22

1  specifically identified banks, where they are incorporated,

2  their particular FDIC numbers, the maturity date for the

3  investments, the term for those investments, the anticipated

4  rate of return and the amount of money that they had invested

5  with him?

6  A.  Yes.  Each of the investments -- following each of the

7  investments, the victims received a statement that this --

8  they were always in this form -- nearly all of them are

9  identical as far as the form and the detail.

10  Q.  And then after having established on those custodial

11  agreements showing that USBANCORP was where the custodial

12  agreements existed, did he then write down on the bottom of

13  each of the investment confirmations that all of the assets

14  were held by the custodian, USBANCORP Trust Company in

15  Johnstown, Pennsylvania?

16  A.  That's correct.  And at one point, they started changing

17  to Ameriserve after the change of the name.

18  Q.  Then during the course of the fraud, Government

19  Exhibit 5, what is this an example of?

20  A.  This is a monthly statement.

21  Q.  This is six.  Excuse me.

22  A.  Mr. Rhoades would periodically send monthly statements,

23  specifically to the school district, and these statements

24  would again have the same amount of detail as the investment

25  confirmation, but they would usually come at the end of the

Smith - Direct              23

1  month or the quarter or the year.

2  Q.  As far as the school district, as far as them believing

3  that money had been invested by Mr. Rhoades, were they

4  actually receiving periodic interest payments from him during

5  the time period of the fraud?

6  A.  Yes.  The school district arrangement was that they

7   received interest payments on them, the principal CD's

8   investments on a per month basis so -- and the amounts of

9   interest that they were receiving would have been the correct

10   amount had Mr. Rhoades actually entered into certificates

11   of -- CD's.

12   Q.   Taking some of the money from the Northwestern School

13   District, or the principal from Northwestern School District,

14   Mr. Rhoades was making these $483.47 payments to Northwestern

15   School District to make it look like they were getting

16   periodic interest?

17   A.   That's correct.  And it would come in a monthly lump

18   some.  So, in this case, $2,400.

19   Q.   And then Government Exhibits 7 and 8 also with regard to

20   Venango County, and Government Exhibit 7, was he sending them

21   investment confirmation forms?

22   A.   That's correct.  Mr. Rhoades was also sending

23   investments confirmations in almost the exact same format to

24   Venango County.

25   Q.   And that's what Government Exhibit 7 identifies?

                    Smith - Direct                24


1   A.   That's correct.

2  Q.   And then Government Exhibit 8, if they were not being

3  paid interest up front, were they getting maturity reports,

4  Venango County that is, claims by Mr. Rhoades as to what

5  amount should be paid to them in interest when their

6  investment matured?

7  A.   Yes.  That was -- Venango County received interest

8  payments on the maturity dates of the CD's.  So, instead of

9  receiving -- for six-month CD's, for example, instead of

10  receiving six monthly interest payments, they would receive

11  one interest payment at the end of the six-month period.

12  Q.   Now, prior to the period of time, '97 to 2004, that this

13  indictment charged, was there a period of time where

14  Mr. Rhoades used this particular scheme, what appeared to be

15  successful investments, paid them back both principal, and

16  what they believed to be principal and interest from their

17  investments?

18  A.   You mean other entities besides --

19  Q.   Well, Venango County and Northwestern first, and then

20  whether there were other entities that appeared to have been

21  paid off.

22  A.   Yes.  This scheme predated the time period in the

23   indictment.  There were some payments to an entity called

24   West Chester Authority, which we later learned is a now

25   defunct water authority in West Chester, Pennsylvania.

Smith - Direct                25

1   Q.  Let's use that as an example.  In 1997, did Venango

2   County pay $495,000 into -- transfer $495,000 into their

3   account that Mr. Rhoades had established on their behalf?

4   A.  I think you are actually referring to the Northwestern

5   School District being transferred 495,000.  I believe that's

6   actually one of the exhibits, and that was in November of

7   1997.

8   Q.  And very shortly after Northwestern School District put

9   in $495,000, what did the account activity show Mr. Rhoades

10  did almost immediately with that money?

11  A.  That very same day, Mr. Rhoades, or within the next day,

12  transferred the money to the pool account.  And then, I

13  believe within three days, had transferred $499,000 to the

14  West Chester Authority and that was, prior to the investment

15  of Northwestern School District, there was only about

16  approximately 30,000 in all of Mr. Rhoades' combined

17  accounts.  Essentially, he immediately used the Northwestern

file:///A|/RHOADES.TXT

18  School District investment to pay West Chester Authority.

19  Q.  And did we attempt to look further into whether West

20  Chester was a victim, and what did we discover?

21  A.  At that point, we tried to locate West Chester

22  Authority, and at that point learned that it was previously a

23  water authority that is now defunct.

24  Q.  So, as far as we can tell, we just know that Mr. Rhoades

25  used Northwestern School District's $495,000 and cut a check

                    Smith - Direct              26

1   out to West Chester Municipal Authority for payment for

2   whatever that happened to be for?

3   A.  That's correct.

4   Q.  And they likely would have been happy for this because

5   it appeared to them that they were paid off for whatever that

6   was, possibly an investment?

7   A.  Right.  Because from the period of November, 1997, to

8   now, it was clear that Mr. Rhoades was engaged in a ponzi

9   scheme and because of the funds used in this later investor,

10  Northwestern School District, was used to pay West Chester

11  Authority, one could reasonably conclude that the ponzi

12  scheme actually extended farther into the past.

13  Q.   Now, in addition to this successful, what appeared to be

14  investments being perpetrated by Mr. Rhoades with his victims

15  over time, did it appear that both Venango County and the

16  Northwestern School District trusted Mr. Rhoades sufficiently

17  to actually roll over all their money instead of having

18  Mr. Rhoades cash it in and start with other investment?

19        Did they continually, during the period of this

20  particular indictment, roll over their funds until the end

21  when there were no funds left?

22  A.   That's correct, because the county and school district

23  both were receiving interest payments, and sometimes

24  principal payments from their investments, they continued to

25  roll these over.  Both of these are governmental entities and

                    Smith - Direct              27


1  some of the monies is earmarked for capital projects.  Some

2  is not needed in the short term.  And as a CD would mature,

3  they would roll it over because they had no current use for

4  those funds and wanted to invest it to have additional funds

5  at a later date.

6  Q.   And they started doing these roll-overs after what

7   appeared to be successful investments with Mr. Rhoades since

8   1997?

9   A.   That's correct.

10  Q.   Now, I put on the screen Government Exhibit 9 for

11  identification.  And is this a chronology of investments that

12  you put together based upon the information that you obtained

13  in the investigation?

14  A.   Yes, it is.

15  Q.   And with regard to Venango County, does this show

16  Judge Cohill an original investment of a million dollars on

17  November 20 of 2000?

18  A.   That's correct.

19  Q.   And then when that was -- after that was supposed to

20  have matured, did Venango County roll over that particular

21  investment for another period for maturity?

22  A.   Yes, it was rolled over.  You can see it was actually

23  rolled over on three separate dates.

24  Q.   Then when they believed that that investment matured,

25  had they rolled them over again?

Smith - Direct                28

1  A.  Yes.

2  Q.  Until October 14th, 2003, where a million dollars was

3  supposed to be paid back to them?

4  A.  That's correct.

5  Q.  Likewise, with other funds, did they invest $300,000?

6  A.  Yes.  And then in July actually added an additional

7  200,000 to that, the original 300,000.

8  Q.  And then December of 2002 rolled that over?

9  A.  Yes.

10  Q.  And December 15th of 2003, that amount, that $500,000

11  investment, should have been paid off to them?

12  A.  That's correct.

13  Q.  The same thing with the Northwestern School District,

14  did they start out in 1997 with that $495,000 investment?

15  A.  That's correct.  And they also rolled that over.  And,

16  as time went on, actually received -- decided not to invest,

17  roll the entire amount over and actually had some of their

18  supposed CD's cashed out and returned to them so that in July

19  of 2004, the outstanding amount was $198,000.

20  Q.  So, what happened at the end?  What happened in October

21  of 2003 and July of 2004 with regard to these victims getting

22  their money back?

23  A.  In October of 2003, the county had a telephone

24  conversation with -- Mr. Rhoades contacted them and asked

25  them if they would like to roll over their investment again.

Smith - Direct                29

1          At that point, they told him no, that they would

2   want the $1,000,000.00 back.  They never heard from

3   Mr. Rhoades again.  And then two months later, they were due

4   an additional 500,000; did not hear from Mr. Rhoades.

5          At that point, our investigation began in late of

6   October, 2003, and we learned of Northwestern School District

7   also being a possible victim and I think they may have been

8   contacted by the bank prior to our contact.  And they also

9   attempted to speak with Mr. Rhoades to obtain some assurances

10   about their funds and they could not contact Mr. Rhoades

11   either.

12  Q.  He never called them back?

13  A.  No.  And they left repeated messages with him to the

14   point where his voice mailbox was full and couldn't leave

15   messages.

16          Then they would call a few days later and it would

17   be cleared out.  Again, they would leave more messages.  Then

18   it would fill up again.

19   Q.   Your investigation showed that the money was just gone?

20   A.   That's correct.

21   Q.   During this timeframe, were there auditors that had

22   already been engaged by the county and the Northwestern

23   School District to regularly audit the finances of both the

24   county and the school district?

25   A.   That's correct.  As governmental entities, they were

                    Smith - Direct              30

1    both required to have financial statement audits.

2    Q.   And in your experience as an auditor with this type of

3    audit, what is the nature of the audit?  What is the audit

4    trying to do?

5    A.   A financial statement audit is trying to detect if the

6    financial statements and records of the county and the school

7    district are free of material misstatement.  The audits are

8    specifically not designed to detect fraud.

9         However, if an auditor were to find that, they

10   would notify their client.  But, those audits are designed to

11   make sure there aren't omissions in the financial statements,

12  there aren't errors or irregularities.

13  Q.   In the course of an audit, how much of an audit is based

14  upon the accuracy of the information being provided by the

15  audit, the entity?  How much is the accuracy of the audit

16  based upon how accurate the information is?

17  A.   There is a significant reliance on the accuracy of the

18  data provided to them.  And the accuracy, honestness,

19  truthfulness of the management, in this case Northwestern

20  School District and the county, their honesty with the

21  auditors.

22         Typically, an audit would include what's called a

23  representation letter where the people responsible for the

24  financial records actually sign a letter stating that they

25  have been truthful, forthright and that they agree to be so

Smith - Direct              31

1  during the course of the audit.

2  Q.   I am going show what I have marked as Government

3  Exhibits 10 and 11, if you would just identify them, and they

4  purport to be documents, standard form confirmations to

5  confirm account balances, Exhibit 10 from Root, Spitznas &

6    Smiley, and then also audit documents from McMahon, O'Polka,

7    Guelcher and Associates, the auditor for Venango County.

8         Can you identify, just for the record, those two

9    documents?

10   A.   Yes.  The first document, Exhibit 10, is what's known as

11   a confirmation.  This was sent by the accounting firm of Root

12   Spitznas, S-p-i-t-z-n-a-s, & Smiley, S-m-i-l-e-y, Inc.  These

13   are the auditors for the school district.  And they sent this

14   confirmation to Mr. Rhoades and to confirm the certificates

15   of deposit that Mr. Rhoades was supposed to be holding on

16   behalf of the school district.

17   Q.   So, on this audit form, is Mr. Rhoades asked to confirm

18   the existence for the auditor, the existence of what appears

19   on the second page of this document the series of supposed

20   purchases of CD's he made with various banks?

21   A.   Yes.  The auditors attached a document to this that

22   details the institution offering the CD, a docket, account

23   cusip number, an interest rate and a fair market value as of

24   June 30, '99.  June 30 is the fiscal year ending of the

25   school district.

Smith - Direct                    32

file:///A|/RHOADES.TXT

1          You will notice on this particular one, it's more

2    than the 495,000 and that is because, other than the

3    investments that we showed, there were also additional

4    investments made by the county and school district for which

5    Mr. Rhoades paid out and so those did not become part of our

6    indictment, but those investments also were not truly

7    invested in certificates of deposit.

8    Q.   As far as the victims knew, they were because they had

9    been paid principal and interest, but you know that

10   Mr. Rhoades had never purchased certificates of deposit

11   during the period of the fraud?

12   A.   Right.

13   Q.   And then, given the opportunity to confirm or deny the

14   existence of these purchases, Mr. Rhoades, in the front of

15   this standard form to confirm account activity, lied and

16   signed that he, as the president, as written on there

17   July 28, 1999, that the investment had, in fact, been made?

18   A.   Yes.  He confirms that the information provided from the

19   auditors is in agreement with his records.

20   Q.   And then Government Exhibit 11, is it similar, although

21   not the standard form, similar document from McMahon,

22  O'Polka, Guelcher and Associates, where they are soliciting

23  from Mr. Rhoades, the person that established these CD's,

24  confirming with him that the CD's had actually been

25  purchased?

Smith - Direct                 33

1  A.   Yes.  This is a different format, but it serves the same

2  purpose, that the auditors McMahon, O'Polka, O-'-P-o-l-k-a,

3  Guelcher, G-u-e-l-c-h-e-r, and Associates, Inc., sent this

4  letter to Mr. Rhoades and attached the actual investment

5  confirmations, and they sent this to Mr. Rhoades to make sure

6  that this was in agreement with his records.

7  Q.   On page two of Government Exhibit 11, given the

8  opportunity to confirm or deny the existence of these

9  investments with Venango County, once again, Mr. Rhoades

10  lies, June 13, 2000, as the president of RCM and, in fact,

11  said the investments have, in fact, been made?

12  A.   That's correct.

13  Q.   Now, Special Agent Smith, did you have the opportunity

14  to put together kind of a spread sheet for the Judge to see?

15       Government Exhibit 12, does this provide kind of a

16  diagram for the Judge as to how Mr. Rhoades utilized various

17   bank accounts, previously established ones, and ones that he

18   created to funnel these funds?

19   A.   Yes.  This actually is a representation of the transfer

20   of funds.  You can see the Venango County account, ROO13,

21   that is the account number, and the Northwestern School

22   District, ROO12, those were accounts held at Ameriserve.  And

23   all of the bolded accounts were held in Ameriserve.

24         You can see the banks below actually listed, the

25   banks the county and the school district were using.  And so

                    Smith - Direct               34

1   the transfers to ROO12 would come out of either an investment

2   into their account at Ameriserve or a maturity, or interest

3   payout out of their account in Ameriserve would come from the

4   account that's titled in their own name.

5         However, previous or prior to or subsequent to that

6   investment or payout, the true source of the funds was

7   account ROO11.  So, an investment in would only pass through

8   ROO12 and an investment out would only pass through that

9   account.

10   Q.   And after Mr. Rhoades funneled the money from -- had the

11  money transferred from the county's actual accounts into

12  their Ameriserve accounts and then up into his pool account

13  and his production account, into what account did Mr. Rhoades

14  transfer those funds that were supposed to be for the

15  purchase of CD's?

16  A.   Mr. Rhoades then transferred the funds into his own

17  personal account at Fleet Bank.  You can see there actually

18  were transfers that were initiated both out of the production

19  and pool account, although approximately, I think, 967,000

20  came from the production account and only 6,000 from the pool

21  account.

22         So, he utilized the production account on a much

23  more frequent basis.

24  Q.   Then did you have the opportunity to dig deeper and find

25  out what happened to the money once it went from Ameriserve

Smith - Direct               35

1  into Mr. Rhoades' own personal Fleet Bank account?

2  A.   Yes.  After the money left Ameriserve and came to Fleet

3  Bank, there were several different destinations of the funds.

4  Q.   I am going to -- hold on a second.  I am going to show

5  you what I have marked as Government Exhibit 13.

6          MR. PICCININI:  And if you can hand that up to the

7    Judge.  I apologize, Judge.  I thought that your screen --

8          THE COURT:  This screen is out of commission.

9    Q.   On Government Exhibit 13, at the top of the particular

10   exhibit, does that show the Ameriserve account, the pool and

11   production accounts into which Mr. Rhoades put the victims'

12   money?

13   A.   That's correct.  That represents a conglomerate of the

14   Ameriserve accounts.

15   Q.   And during the period of the fraud, did he transfer

16   $973,500 into his own personal Fleet Bank account?

17   A.   That's correct.

18   Q.   And then what happened with the money from there?

19   A.   Approximately 375,000 left the account in checks either

20   made payable to Gary Rhoades or cash.  We noticed that a lot

21   of those had been negotiated at Richwood Banking Company.

22   And, you know, we saw retail debit card purchases and ATM

23   transactions coming out of Richwood Banking Company.

24   Approximately $145,000 were withdrawn from ATM's.

25   Approximately $388,000 was used to pay American Express bills

Smith - Direct              36

1  both in accounts under Gary Rhoades' name and under Catherine

2  Rhoades' name, his then wife.  Another 9,000 was in checks

3  payable to either Catherine Rhoades or Carrie Transki.

4  Transki is Rhoades' stepdaughter, I believe.

5  Q.   So, from the nature of your -- from the results of your

6  investigation, it appears that all of the $973,500 during the

7  period of this fraud that Mr. Rhoades stole from his victims,

8  he spent almost every dime of it?

9  A.   Almost, yes.  Or we can't, you know, track down every

10  dime, but it appears that almost the majority of it has been

11  expended.

12  Q.   Now, with regard to the amount of money that Mr. Rhoades

13  took from his victims, the principal that the school

14  district -- excuse me -- that the principal that both

15  Northwestern and the Venango County folks invested with him,

16  would that be the amount of $1,698,000?

17  A.   That's correct.

18  Q.   And then as far as the interest that they anticipated

19  receiving from Mr. Rhoades with regard to the Venango County,

20  would that have been around $25,100?

21  A.   That's a very close approximation, yeah.

22  Q.  And then with the Northwestern School District, should

23  they have also received $5,468 in interest in addition to the

24  principal back from Mr. Rhoades?

25  A.  That's correct.

                    Smith - Cross            37


1  Q.  And the total, therefore, is about $1,728,568 that this

2  man stole from these victims?

3  A.  That's correct.

4       MR. PICCININI:  That's all I have, Your Honor, and

5  I would request the admission into evidence of each of the

6  thirteen Government's Exhibits.

7       THE COURT:  Government Exhibits 1 through 13 are

8  admitted.

9       Miss Davis, has Government Exhibit 13 been

10  admitted?

11      MS. DAVIS:  It has, Your Honor.

12      MR. PICCININI:  Thank you, Your Honor.

13      MR. PATTON:  Your Honor, I need a copy of

14  Government Exhibit 2, which is the custodial agreement,

15  because I am going to be asking the agent some questions

16    about that.

17         THE COURT:  There you go.

18              CROSS-EXAMINATION

19   BY MR. PATTON:

20   Q.   Agent Smith, you had testified that you have some

21   experience doing audits?

22   A.   That's correct.

23   Q.   And is it accurate to say that you worked as a certified

24   public accountant for a little over four years?

25   A.   That's approximately, yes.

                    Smith - Cross              38

1   Q.   And then after those four and a half years is when you

2   became employed with the FBI, is that correct?

3   A.   Correct.

4   Q.   You had testified about the custodial agreement that was

5   entered into between Venango County and what I am going to

6   just refer to as Ameriserve.

7   A.   Okay.

8   Q.   And that is Government Exhibit 2.

9   A.   Okay.

10   Q.   Is it fair to say that this was a virtually identical

11  custodial agreement between the Northwestern School District

12  and Ameriserve?

13  A.  Yes.

14  Q.  And under that agreement, Mr. Rhoades was appointed the

15  agent of the investor but only upon the terms and conditions

16  set forth within the custodial agreement, is that correct?

17  A.  Yes, that's the text of it.

18  Q.  And so Mr. Rhoades' agency relationship with the county

19  or the school district under this agreement is limited to the

20  terms of this agreement, correct?

21  A.  Yes.  That's what it reads, correct.

22  Q.  And the agreement has a section that's entitled Duties

23  of the Agent and Custodian, is that correct?

24  A.  Correct.

25  Q.  And that indicates that the custodian will execute

Smith - Cross                    39

1  purchases and redemptions pursuant to the investor's order

2  directly, or through the agent for the investor's account of

3  various investments, then lists a number of different

4  investments, is that correct?

5  A.  Correct.

6  Q.  And the agreement then states that the agent and the

7  custodian will not render advice as to the value of, or make

8  recommendations as to the advisability of purchasing or

9  selling the investment?

10  A.  Correct.

11  Q.  And under the terms of the agreement, the -- any

12  investment that is purchased on behalf of either Venango

13  County or the school district is to be deposited with the

14  custodian, that being Ameriserve, is that correct?

15  A.  Where do you see that?  I don't have the whole document

16  on the screen.

17  Q.  Under number one, under registrations it said that

18  investment held for the investor's account by the custodian

19  may be placed in the nominee name of U.S. National Bank Trust

20  Department as custodian for Venango County GO bond issue,

21  1989 project?

22  A.  It says they may be placed in a nominee name at what is

23  Ameriserve.  Doesn't say that they have to be; at least the

24  way I interpret that registration sentence.

25  Q.  And under the statements section, it says that the

1   custodian will send a confirmation as purchases and sales are

2   made for the investor and a monthly statement setting forth

3   all transactions during the period and the value of each

4   outstanding investment?

5   A.   That's correct.

6   Q.   And then the investor is to notify the custodian if the

7   investor believes that there is any inaccuracy in the

8   statements, is that correct?

9   A.   Correct.

10   Q.   And Ameriserve did send monthly statements to both

11   Venango County and the school district?

12   A.   That's correct.

13   Q.   But, none of the statements to Venango County, at least

14   in the time period of the indictment, none of the statements

15   to either the school district or to Venango County ever

16   indicated that there were -- that Ameriserve was holding any

17   assets on behalf of either Venango County or the school

18   district, correct?

19   A.   I would agree with that, in most part, it showed that

20   they had put money into the account.  So for one day, they

21  held assets.  Then the money left the account.  Sometimes it

22  left the same day.  If you are asking if it showed the CD's,

23  it did not show any CD's there.

24  Q.  So, the statements that Ameriserve would send both the

25  school district and the county would show money coming into

                    Smith - Cross              41

1  the county, school district funds, and then that money taken

2  out very quickly.

3  A.  Correct.

4  Q.  But, the statements never showed any CD's or any other

5  asset that was actually either purchased being held by

6  Ameriserve for the county or the school district?

7  A.  That's correct.

8  Q.  And in the Appointment of Agent and Custodian paragraph

9  at the top, it states that United States National Bank, or

10  its successors, as custodian, is appointed custodian for the

11  purpose of holding cash and investments of the investor

12  purchased by the custodian hereunder or otherwise transferred

13  to the custodian by the investor for safekeeping, correct?

14  A.  That's what it reads, yes.

15  Q.  So, the bank is the custodian, meaning the bank is the

16  one that is supposed to be having custody of any investments

17  that were actually purchased under the agreement?

18  A.   The bank is the custodian for purposes of holding cash

19  investments, and if investments are --

20       THE COURT:  Excuse me.  Try to keep your voice up

21  until that calms down.

22       THE WITNESS:  To go back and answer your question,

23  it says that they are the custodian for purposes of holding

24  cash and investments of the investor purchased by the

25  custodian or otherwise transferred.

                    Smith - Cross                42

1        Maybe you can clarify the question.  I am not sure

2  what the question is.

3  Q.   The bank is appointed the custodian on behalf of Venango

4  County and in the agreement with the school district, for the

5  school district as well?

6  A.   Correct.

7  Q.   For the purposes of holding investments that are

8  purchased on behalf of either the school district or the

9  county?

10  A.  Correct.

11  Q.  Now, Mr. Rhoades did actually work for Irwin Union

12  Capital Corporation, correct?

13  A.  That's what the records show, yes.

14  Q.  Have you done any investigation to determine whether

15  that is accurate or inaccurate?

16  A.  Yes.  My investigation was to obtain those records, and

17  those show that he did work for Irwin Union.

18  Q.  And Irwin Union Capital Corporation was a legitimate

19  corporation?

20  A.  As far as I know, yes.

21  Q.  And as far as you know, Mr. Rhoades had, in fact, at one

22  time been employed by the City of Erie, is that correct?

23  A.  I believe my information was that it was the county.

24  Q.  Or the county.  In the Finance Department?

25  A.  Correct.

Smith - Cross                43

1  Q.  Now, under the terms of the custodial agreement that

2  Mr. Rhoades had, is it accurate that the county and the

3  school district were to wire money into the accounts at

4  Ameriserve, that Mr. Rhoades was to be able to access that

5  money so that he could then take the money, purchase

6  investments and then put those -- give those investments to

7  Ameriserve to hold as the custodian?

8  A.   That was the purpose of the custodial agreement.  It

9  doesn't actually specify that Mr. Rhoades -- you know, in

10  that detail and I don't think it -- you know, that it's not

11  an exclusive arrangement that Mr. Rhoades has to bring CD's

12  back to Ameriserve.

13  Q.   But, it was the understanding of both the school

14  district and Northwestern that the CD's that they thought

15  were being purchased were being held by Ameriserve?

16  A.   Yeah, that is what they believed.

17  Q.   And you confirmed that with both school district and

18  with Venango County?

19  A.   Yes; and some of that indication comes from the

20  statements as well.  The statements tell them that as such.

21  Q.   It's accurate to say that every statement that you are

22  aware of that Mr. Rhoades sent to either the school district

23  or Venango County would say on the statement that all assets

24  were being held by Ameriserve?

25  A.   That's correct.

1  Q.   And that appeared in all of the investment confirmations

2  Mr. Rhoades sent out, correct?

3  A.   Yeah.  Just so we are not confusing -- investment

4  confirmations sent by Mr. Rhoades, yes, it appeared in there.

5       If you are getting at the auditor confirmation,

6  that is something different.

7  Q.   But, the confirmations that Mr. Rhoades sent out, those

8  investment confirmations, he would put on those statements

9  all assets are being held by Ameriserve?

10  A.   Correct.

11  Q.   And the monthly statements that Mr. Rhoades would send

12  out would say all assets are being held by Ameriserve?

13  A.   Yes.

14  Q.   And the maturity reports that Mr. Rhoades sent out said

15  that all assets were being held by Ameriserve?

16  A.   Yes.

17  Q.   And so it was clear to Venango County and to the school

18  district that, as far as they were concerned, the actual CD's

19  were being held by Ameriserve?

20  A.   Yes, that was their impression and their belief.

21  Q.  And, in fact, with your chronology of investments that

22  laid out the different amounts that were invested by the

23  Venango County and the school district, which is Government

24  Exhibit 9, for each one of those transactions there is either

25  an investment confirmation or a monthly statement sent out by

                    Smith - Cross              45

1  Mr. Rhoades with regard to each one of these transactions?

2  A.  That is correct.  Typically, there was a maturity

3  report, which was the date that CD's matured, and then as

4  they rolled them into the next set of CD's, there was an

5  investment confirmation.

6       So, there were two documents when the CD's matured.

7  Q.  And those different documents sent out by Mr. Rhoades,

8  be they the maturity report or investment confirmations or

9  monthly report, are represented in Government's Exhibits 6, 7

10  and 8?

11  A.  I don't have them in front of me.  But, yes, they were

12  represented in the documents presented to me this morning.

13  Q.  For example, Government Exhibit 6, which is a monthly

14  statement to the school district, is that correct?

15  A.  Correct.  And it does read that the assets are held by

16  the custodian.

17  Q.  Now, when October of 2003 came and the county wanted

18  their principal back because they weren't going to roll it

19  over, that's when Mr. Rhoades stopped communicating with the

20  county and the county learned that something was wrong, is

21  that correct?

22  A.  That's correct.

23  Q.  And, in fact, then the former treasurer, Miss Spence,

24  then contacted Ameriserve directly, correct?

25  A.  I don't know if the treasurer, Miss Spence, contacted

                    Smith - Cross              46

1  Ameriserve directly or not.  I know the current treasurer and

2  members of the county government had contacted Ameriserve.

3        I think you may be referring to Miss Sharp, the

4  current treasurer.

5  Q.  And when the county contacted Ameriserve, they asked

6  Ameriserve about the status of the CD's Ameriserve had on

7  account for the county?

8  A.  Correct.

9  Q.  And Ameriserve informed the county that Ameriserve had

10   no CD's on account for the county?

11   A.   Correct.

12   Q.   And that they never had had any CD's on account for the

13   county?

14   A.   For that time period, yes, the time period of the

15   indictment.

16   Q.   The time period of the indictment?

17   A.   Yes.

18   Q.   Now, Mr. Piccinini asked you some questions about audits

19   and what they are designed to do and what they are not

20   designed to do.

21        I want to ask you some questions on that area.

22   A.   Sure.

23   Q.   An audit is not designed to detect fraud, correct?

24   A.   A financial statement audit, which was what these two

25   auditing firms were engaged to do, is not designed to detect

                    Smith - Cross                47


1   fraud, correct.

2   Q.   But, a financial statement audit is designed to detect

3   material misstatements on financial statements, correct?

4   A.   Correct.

5   Q.   And included in these statements, in the financial

6   statements, would be listing assets that are owned by the

7   entity being audited, correct?

8   A.   Correct.

9   Q.   And so part of the auditing process, the financial

10   statement auditing process, would be confirming the existence

11   of the assets that are related on the entity's financial

12   statements, correct?

13   A.   That's correct.

14   Q.   And so part of the auditing procedures, for both the

15   audits done for the school district and for the county, was

16   the auditors confirming the existence of assets that were

17   listed by either the county or the school district on their

18   financial statements, correct?

19   A.   That is part of their audit, correct.

20   Q.   And, for example, the school district in its financial

21   statements, it listed the CD's that it thought it had

22   invested through Mr. Rhoades, they listed those CD's on their

23   financial statements, correct?

24   A.   I believe that those would be included in an amount on

25   their financial statements.  Whether they actually listed the

Smith - Cross                48

1    individual CD's, I am not aware of that.

2    Q.   But, if they don't have the individual CD's listed, they

3    will have listed that this amount of money is invested in

4    CD's?

5    A.   Yes, this would be a --

6    Q.   And the school district would do the same thing?

7    A.   Correct.

8    Q.   And then during the audit process, the CPA firms doing

9    the audits would try and confirm the existence of those CD's?

10   A.   Correct.

11   Q.   Because the auditing firms would need to make sure that

12   the statement on the financial statements that the county had

13   a million and a half dollars invested in CD's was accurate?

14   A.   Correct.

15   Q.   Because if the county had listed on their financial

16   statements that they -- that one of their assets was a

17   million and a half dollars invested in CD's and if that was

18   not truly the case, that would be a material misstatement on

19   the county's financial statements?

20  A.  I haven't done their audit so I wouldn't be able to tell

21  you what the materiality levels are and whether that would be

22  material.  But, I would presume, based on the size of the

23  county, that 1.5 million would be material.

24  Q.  And the same for the school district.  If the school

25  district's financial statement said we had either $495,000

                    Smith - Cross                49

1  invested in CD's, or later 198,000 invested in CD's, part of

2  the auditing process would be to confirm that those CD's

3  existed?

4  A.  That's correct.  And, again, with the school district, I

5  did not review their financial statements and whether I would

6  be -- I wouldn't be confident in saying -- I would be much

7  less confident in saying whether $198,000 would be material

8  for them.

9  Q.  Now, you and Mr. Piccinini talked about some exhibits

10  that were used by the various accounting firms in doing the

11  audits.

12  A.  Correct.

13  Q.  And one of the items that you guys talked about was

14  Government Exhibit 10, is that correct?

15  A.  Correct.

16  Q.  Now, that was a form sent by the school district's

17  accountants, that would be Root, Spitznas, to Mr. Rhoades,

18  correct?

19  A.  Correct.

20  Q.  The purpose of that being to try and confirm the

21  existence of the CD's that the school district thought it had

22  purchased?

23  A.  The existence and the value.

24  Q.  Now, that form is entitled Standard Form to Confirm

25  Account Balance Information with Financial Institutions, is

Smith - Cross                    50

1  that correct?

2  A.  Correct.

3  Q.  Rhoades Capital Management was not a financial

4  institution, correct?

5  A.  It's what you want to characterize it.  I mean, is it

6  registered as a bank?  No.  I mean, I don't know if you want

7  to characterize it as a financial institutions or not.  I --

8  Q.  And to your knowledge, did Root, Spitznas send

9   confirmation notices to Ameriserve?

10  A.   No, they did not; not that I know of, no.

11  Q.   Government Exhibit 11 is a confirmation form used by

12  McMahon, O'Polka, Guelcher, and Associates, the CPA that the

13  county used, correct?

14  A.   Correct.

15  Q.   And basically a cover letter indicating what they are

16  trying to confirm, but then also attaching the investment

17  confirmations sent by Mr. Rhoades to the county.  Those

18  statements were attached to the verification that McMahon,

19  O'Polka sent, correct?

20  A.   Yes.

21  Q.   And the statements from Mr. Rhoades, the -- for example,

22  one of them is a statement dated December 16th, 1999, and

23  it's referring to a $100,000 CD that is purported to be

24  purchased from First Fidelity Investment & Loan in

25  California, is that correct?

                    Smith - Cross              51


1   A.   Correct.

2   Q.   And that statement at the bottom, as all of Mr. Rhoades'

3   statements did, stated that all assets are held by the

4    custodian, here it says USBANCORP, but that's the predecessor

5    to Ameriserve, correct?

6    A.   I believe it says that.  But, if you can slide it up, I

7    can conform that.  Yes.

8    Q.   And that confirmation also included a statement from

9    Mr. Rhoades dated December 16th, 1999, wherein the investment

10   or the monthly statements from Mr. Rhoades purports to say

11   that there is a CD in the amount of $100,000 purchased from

12   Life Bank in California, is that correct?

13   A.   Correct.

14   Q.   And, again, that statement from Mr. Rhoades on his

15   business letterhead states that all assets are held by the

16   custodian, is that correct?

17   A.   Correct.

18   Q.   And when they refer to all assets, that's referring to

19   the CD's themselves, correct?

20   A.   Yes.

21   Q.   And to your knowledge, McMahon, O'Polka never sent any

22   confirmation notices to Ameriserve, is that correct?

23   A.   Correct.

24   Q.   Now, while an audit is not designed to detect a fraud,

25   sometimes in the course of conducting an audit a fraud is

Smith - Cross              52

1   discovered, is that correct?

2   A.   That's possible, yes.

3   Q.   Or even if you just -- something comes back where

4   someone is not confirming the existence of an asset, the

5   auditors will report that to the entity they are auditing,

6   correct?

7   A.   Certainly.

8   Q.   The auditors, it's not part of their job then to go out

9   and figure out what happened to that asset?

10   A.   Correct.

11   Q.   But, the auditors will bring that to the attention of

12   the people being audited?

13   A.   Correct.

14   Q.   And so through that process, frauds can be detected?

15   A.   Correct.  And if I can clarify, they will bring it to

16   the attention of the private person engaging them to conduct

17   the audit.  In some cases, a third-party entity may have an

18   auditor audit someone.  They may not report it to management

19   in the company.

20  Q.  In this case, it would have been -- in this case, it was

21  the management, so to speak, of the county and the management

22  of the school district that had asked for the audit, correct?

23  A.  Correct.

24  Q.  And, therefore, the auditors would report any

25  materiality misstatements to either the county or the school

                    Smith - Cross            53

1  district?

2  A.  Correct.

3  Q.  Mr. Rhoades never had the ability to prevent either the

4  county or the school district from contacting Ameriserve, is

5  that correct?

6  A.  I think in some ways you could say that's not correct

7  because by providing them with statements, confirmations

8  confirming things with the auditors, he had -- he had the

9  ability to persuade them or provide other evidence that would

10  cause them not to confirm it with Ameriserve.  If they wanted

11  to, he didn't have the ability to physically stop them, but

12  he had the ability to motivate them in ways to prevent them

13  from doing that.

14  Q.  Well, under your reading of the custodial agreement,

15  Mr. Rhoades was not required to deposit the contracts with

16  Ameriserve, correct?

17  A.  It's just -- the custodial agreement allowed an

18  arrangement that allowed him to do such a thing.  It didn't

19  require him.  No, it wasn't exclusive.

20  Q.  So, under the custodial agreement, Mr. Rhoades could

21  have said I am the one that has the CD's?

22  A.  He could have said that, yes.

23  Q.  And Mr. Rhoades did not do that, correct?

24  A.  Correct.

25  Q.  In every instance when Mr. Rhoades would send any type

                    Rollage - Direct            54

1  of written confirmation to either the county or the school

2  district regarding the supposed CD's, every one of those he

3  would say the assets are being held by Ameriserve?

4  A.  Correct.

5       MR. PATTON:  Can I have a moment, Your Honor?

6       Those are my questions, Your Honor.

7       THE COURT:  Any redirect?

8       MR. PICCININI:  No, Your Honor.

9         THE COURT:  Thank you, Mr. Smith.

10   (The witness was excused.)

11        MR. PATTON:  I think our next witness is going to

12   take some time, so I don't know if you want to go ahead.

13        THE COURT:  Let's take a break now and then we'll

14   reconvene at eleven o'clock.

15   (Court recessed at 10:45 a.m.)

16   (Court reconvened at 11:00 a.m.)

17        THE COURT:  Be seated, please.  Okay, Mr. Patton.

18        MR. PATTON:  Your Honor, I would call Michael

19   Rollage.

20        THE COURT:  Would you come forward and be sworn,

21   please?

22        THE CLERK:  Can you raise your right hand?

23              * * * * *

24        MICHAEL P. ROLLAGE, having first been duly sworn,

25   testified as follows:


                   Rollage - Direct          55


1         THE COURT:  Have a seat up there, please, give us

2    your name and spell your last name.

3          THE WITNESS:  Michael P. Rollage.  R-o-l-l-a-g-e.

4          THE COURT:  Thank you.

5                    DIRECT EXAMINATION

6  BY MR. PATTON:

7  Q.  Mr. Rollage, where do you work?

8  A.  I am a partner in the firm of McCrory & McDowell in

9  Pittsburgh.

10  Q.  What kind of firm are you guys?

11  A.  We are a certified public accounting and consulting

12  firm.

13  Q.  Can you give the Judge kind of a breakdown of your work

14  experience as a CPA?

15  A.  Yes.  I graduated from the University of Cincinnati in

16  1970.  I had been -- spent three years prior to graduation as

17  a co-op student with a firm that is now known as

18  Ernst & Young.  And then for the ensuing three years, I was

19  the -- I was on the Ernst & Young audit staff, rising from --

20  starting off as a staff accountant to senior accountant to a

21  supervisor.

22          In 1973, mid to late 1973, I left the firm of

23  Ernst & Young and went to work as the controller of a

24  mechanical contractor in Pittsburgh by the name of Pittsburgh

25  Mechanical Systems.


Rollage - Direct              56


1       I left there after about two and a half years and

2  became the CFO of a company, of a heavy highway contractor by

3  the name of Gal Construction located in Belle Vernon and left

4  there in 1983.

5       In January of 1984, I joined the firm of McCrory &

6  McDowell.  I then became a partner there about six months

7  later, and I am responsible for our construction services

8  practice at McCrory & McDowell which consists of audits,

9  reviews of financial statements and consulting in the

10  construction industry.

11       In addition, I'm an adjunct professor at the

12  University of Pittsburgh teaching a course in construction

13  finance and cost control.

14  Q.  Do you have any professional licenses or certifications?

15  A.  Yes.  I'm a certified public accountant in the State of

16  Pennsylvania.  I'm accredited by the American Institute of

17  CPA's and an accredited business valuator and I'm a certified

18  valuation analyst.

19  Q.  Do you belong to any professional or trade

20  organizations?

21  A.  Yes.  American Institute of Certified Public

22  Accountants, the Pennsylvania Institute of Certified Public

23  Accountants, the Construction Financial Manager's

24  Organization and several trade associations affiliated with

25  the construction industry.

                    Rollage - Direct                57

1  Q.  Do you do any type of volunteer work?

2  A.  Yes.  I'm the treasurer of my church.  I do volunteer

3  work for the Pittsburgh Food Bank.  I have been quite

4  involved in the Boy Scouts of America and have done some work

5  for a group called Youth Opportunities Unlimited in

6  Pittsburgh.

7  Q.  In your employment as a certified public accountant,

8  have you performed audits?

9  A.  Yes, I have.

10  Q.  How long have you been doing that?

11  A.  Well, again, I have been with McCrory & McDowell for a

12  little over twenty years, and that's really all I do.  I'm on

13  the audit staff and the bulk of my work is audits.

14          MR. PATTON:  Your Honor, I would offer Mr. Rollage

15   as an expert in certified public accounting and audits.

16          THE COURT:  Any voir dire, Mr. Piccinini?

17          MR. PICCININI:  No, Your Honor.

18          THE COURT:  He may testify as an expert in the

19   field of accounting.

20   BY MR. PATTON:

21   Q.  Mr. Rollage, can you just explain, in general terms,

22   what an audit is?

23   A.  A CPA firm has three levels of assurance that they can

24   issue with financial statements.  The highest level of

25   assurance is an audit and that's followed by a review, and

                    Rollage - Direct                58

1   then the least level of assurance is a compilation.

2   Q.  What is an audit designed to do?

3   A.  An audit is designed to give the reader of the financial

4   statement, that the financial statements are prepared in

5   accordance with generally accepted accounting principles and

6   that they follow generally accepted auditing standards in the

7   preparation of that -- and the execution of their work in

8   preparing that financial statement.

9   Q.   Is the audit, itself, designed to detect fraud within

10   the entity or company being audited?

11   A.   No, it is not.

12   Q.   During the course of conducting an audit, can a fraud be

13   discovered?

14   A.   It can be.

15   Q.   And if that happens, what does the auditor do?

16   A.   They would report to the people who have engaged them

17   that they found something.  They may withdraw from the

18   engagement or they may proceed and help to quantify the fraud

19   and proceed on in the engagement.

20   Q.   When you are engaged to conduct an audit of an entity's

21   financial statements, what is the first step of what the

22   auditors have to do?

23   A.   The first step is that they have to gain an

24   understanding of what we refer to as the control environment.

25   And that is, the control environment is the environment that

Rollage - Direct                59

1   exists for the safeguarding of assets and the transactions

2   that take place that they, in fact, are what they say they

3   are.

4       So, the auditor, the first thing they would do

5   would be to gain an understanding of that control

6   environment.

7   Q.  Is it incumbent upon the auditor to, when you say become

8   familiar with the control environment, to sit down with the

9   management of the entity being audited to learn the facts

10  behind what's listed on the financial statements and how

11  financial transactions are conducted and how assets are held,

12  and things of that nature?

13  A.  Yes, it is.

14  Q.  And once an auditor becomes sufficiently familiar with

15  the control environment in the entity that's being audited,

16  what do you then do?

17  A.  You would develop an audit program that would be

18  designed to test the control environment as it's been

19  represented to you and to be able to form conclusions with

20  respect to the existence of assets.

21  Q.  And after those procedures have been developed and have

22  been followed through, ultimately what is it that the

23  auditors want to be able to go back and tell the management

24  of the entity that's being audited?

25  A.  Ultimately, they want to be able to issue their opinion

Rollage - Direct            60

1  on the financial statements.

2       THE WITNESS:  Is that me bouncing that or --

3       THE COURT:  No, that is all right.

4       THE WITNESS:  Okay.  They are -- their ultimate

5  goal is to be able to issue a financial statement and then to

6  issue an opinion on the financial statement stating what they

7  did, that the statements are prepared in accordance with

8  generally accepted accounting principles and that their audit

9  was conducted in accordance with generally accepted auditing

10  standards.

11  Q.  Could you just briefly explain what generally accepted

12  auditing standards are?

13  A.  Generally accepted auditing standards are standards that

14  are promulgated by the American Institute of Certified Public

15  Accountants, and there are general standards, standards of

16  field work, standards of -- that the auditor has to go

17  through in order -- in developing the test that he is

18  conducting.

19        Management is, in essence, making assertions as to

20   the classifications and existence of account balances, be

21   they assets, liabilities, income, expenses.  And what the

22   auditor is designed -- the audit is designed to determine

23   whether there could be a material misstatement or a -- on one

24   of those assertions, that when you take all of them in total,

25   they are going to cause a misstatement on the financial


                  Rollage - Direct              61


1   statement itself.

2   Q.   Is part of doing the audit and checking on the

3   assertions made in the financial statements attempting to

4   verify the existence of assets that are listed by the entity

5   being audited on their financial statements?

6   A.   That would be one of many procedures that would be

7   undertaken in order to satisfy yourself that those assertions

8   are, in fact, correct.

9   Q.   I want to ask you some questions now designed more -- or

10   with regard more to the facts of this particular case.

11   A.   Okay.

12   Q.   Have you had a chance to review the audits that were

13  performed on behalf of the Northwestern School District and

14  Venango County?

15  A.  I analyzed the financial statements, yes.

16  Q.  And have you had a chance to review the indictment in

17  this case?

18  A.  I have read them, yes.

19  Q.  And have you had a chance to review the search warrants

20  done by the FBI agents describing in general their

21  investigation of Mr. Rhoades?

22  A.  Yes.

23  Q.  And I want to ask you some questions about the CD's or

24  the CD's that were supposed to have existed in this case.

25  A.  Okay.

                    Rollage - Direct                62

1  Q.  And for right now, I'll ask about the county.

2       And if you were doing an audit of the county's

3  financial statements and the county's financial statement

4  listed as an asset a million and a half dollars in CD's, as

5  part of your audit, would you need to try and verify that

6  information?

7  A.  Yes.

8  Q.  What steps would you take to verify that information?

9  A.  Well, the first step I would take is to determine what

10  the control environment was that existed around those audits.

11  That would consist of determining, number one, who had the

12  authority to make the investments.  Under what rules,

13  regulations, whether it was Pennsylvania Code, or in this

14  particular case, or whatever, they were allowed to make the

15  investments, who had the authority to make the investment.

16  And then I would want to determine the existence of the

17  asserted balance that was reported on the balance sheet.

18  Q.  How would you try to confirm the existence of the CD's

19  in this case?

20  A.  I would send a confirmation.

21  Q.  And who would you send the confirmation to?

22  A.  To the custodian of the funds.

23  Q.  And through your attempts to gain an understanding of

24  the control environment, would you have talked with the

25  county officials to determine where physically the CD's were

Rollage - Direct                63

1  supposed to be?

2  A.  Yes.

3  Q.  Once you learned from the county officials, either

4  through written documentation or through their oral

5  representations to you, where would you go to verify the

6  existence of --

7  A.  I would -- I could do one of two things.  If the assets

8  were held in a safe deposit box in a bank that was local, I

9  could go and count them or -- physically count them.  Or I

10  could design a bank confirmation or a confirmation to send to

11  that institution verifying or asking them to verify that

12  those assets were being held in safekeeping.

13  Q.  In your meeting with the county officials and -- or your

14  review of the documentation that the county officials gave to

15  you indicated that the county officials believed that the

16  million and a half dollars in CD's that they thought they had

17  invested were being physically held in Ameriserve Bank in

18  Johnstown, Pennsylvania, but had been purchased on behalf of

19  the county by Gary Rhoades but then deposited at Ameriserve,

20  where would you go to confirm the existence of those CD's?

21  A.  Ameriserve.

22  Q.  And why would you go to Ameriserve?

23  A.  Gary Rhoades would have been the agent.  That would be

24  like asking the fox to tell me how many hens were in the hen

25  house.

Rollage - Direct                64

1  Q.   And would -- under -- if you were using generally

2  accepted auditing standards, would you have sent a

3  confirmation to Gary Rhoades?

4  A.   I would not.

5  Q.   And if your engagement letter with the county stated

6  that you were going to use generally -- or the audit would be

7  done pursuant to generally accepted auditing standards, would

8  you send the confirmations to Gary Rhoades?

9  A.   No.  I might add, an auditor is responsible for after

10  they gain an understanding of the control environment and if

11  they determine that confirmations are to be sent, if they

12  decide that that is the appropriate test, then they are to

13  send it to the party that they determine is most likely to

14  give them -- to verify that these assets existed.

15        In the particular case, Mr. Rhoades is the agent

16  and I would not send it to the agent, but rather to the

17  custodian because they are the people that were holding the

18  funds supposedly.

19  Q.   And so, for example, if you look on your screen showing

20  Government Exhibit 11, which was a confirmation request sent

21  out by McMahon, O'Polka, Guelcher and Associates, which was a

22  CPA firm engaged by the county, attached to that confirmation

23  is -- are some monthly statements sent by Mr. Rhoades to the

24  county regarding in -- for example, in this case a $100,000

25  CD, and that statement, itself, at the bottom says that all


                    Rollage - Direct              65


1   assets are held by the custodian, in this case, USBANCORP

2   Trust Company Johnstown, Pa.

3        If you had been shown that monthly statement from

4   Mr. Rhoades that had that information on it, where would that

5   tell you as an auditor you needed to go to confirm the

6   existence of that CD?

7   A.   To USBANCORP.

8   Q.   Should you go to Mr. Rhoades to verify the existence of

9   that asset?

10  A.   In my professional opinion, no.

11  Q.   If the auditors sent the confirmation notice to

12  Mr. Rhoades and did not send a confirmation to USBANCORP,

13  would that be in accordance with generally accepted auditing

14  standards?

15  A.   Again, I don't think that it was -- they -- I have not

16  had the opportunity to talk to the CPA's or to look at their

17  assessment of the control environment, but based on the

18  information that I have seen, the control environment was

19  that there was an agent and that agent invested the

20  securities with a particular bank, and I believe that the

21  most appropriate method of confirming the existence of those

22  assets would have been to send the confirmation to the

23  institution that was holding them.

24  Q.   And you heard the testimony from Agent Smith earlier

25  that the officials in Venango County believed, wrongly, but

                    Rollage - Direct           66

1  the county officials believed that the CD's were being held

2  by Ameriserve Bank.

3  A.   Yes, I recall that.

4  Q.   And so if the county officials, if they had passed that

5  information on to you as an auditor that it is our

6  understanding that these investments are being held by

7   Ameriserve Bank, would you have sent a verification to

8   Ameriserve?

9   A.   Absolutely.

10   Q.   For the reasons that you discussed?

11   A.   That's correct.

12   Q.   Now, if your engagement letter with the county said that

13   you would conduct the audit using generally accepted auditing

14   standards, but the letter also said that, look, the purpose

15   of the audit is not to detect fraud, that the audit is not a

16   guarantee of the accuracy of the financial statements and is

17   subject to the inherent risk that errors, irregularities or

18   illegal acts might not be uncovered through the audit, would

19   that change, in any way, your determination of where you

20   would send the confirmation?

21   A.   I don't believe so.  You used the term "inherent risk."

22        When you're preparing financial statements, the

23   first thing, as I said, you do is, you evaluate the system of

24   internal control and you are evaluating risk in the system of

25   internal control.  Two types of risk; one is control risk and

Rollage - Direct            67

1   two is inherent risk.  Inherent risk is that risk that a

2   possible misstatement could, in fact, take place if there

3   were no other controls in effect.

4        So, when the CPA would have gained an understanding

5   of the control environment, they should -- they should have

6   been told that the -- there was an agent involved, that the

7   securities were, in fact, held by USBANCORP.  And, in fact,

8   the internal documentation appears to have indicated that.

9        And so, therefore, the professional judgment that I

10  believe should have, or conclusion that should have been

11  reached was that the appropriate place to confirm the

12  existence of that asset was USBANCORP.

13  Q.  When you talk about inherent risk, in the way the CD's

14  were purchased, or purported to be purchased in this case,

15  where the money was taken by an agent and then was supposed

16  to be used to buy CD's, then deposit the CD's with a bank, is

17  there inherent risk in that setup?

18  A.  Yes.  There -- well, there is the -- the inherent risk

19  is, A, did the person who gave the authority to buy the

20  securities have that authority?  That is one.

21        So, in gaining your understanding of the control

22  environment, you would determine who has that authority and

23   from there you would test that.

24        Two.  You would look at the agency relationship and

25   ask in -- my professional opinion, you would ask if there

Rollage - Direct                 68

1   is -- is there any type of an agreement that you have with

2   the agent that you are -- that is purchasing from you -- with

3   you?

4        And then you would look at that and determine

5   what's supposed to happen there.  And based upon the

6   inquiries that you make and the documentation that you

7   receive, you'll design your audit test accordingly.

8        And from what I have heard today and what I have

9   read, I believe that leads you to the conclusion that the

10   appropriate place in order to have reasonable assurance that

11   the assertion that was made may be incorrect would have been

12   to send that bank confirmation to USBANCORP.

13   Q.  Okay.  And prior to today, did you have an opportunity

14   to review what has been marked here as Government Exhibit 2,

15   which is the custodial agreement between Venango County and

16   Ameriserve?

17   A.  Yes.

18  Q.   And you also have had an opportunity to review the

19  custodial agreement between Mr. Rhoades or Rhoades Capital

20  Management and Ameriserve?

21  A.   Yes.

22  Q.   And I believe your testimony just was that once you

23  found out about the circumstances under which -- or the

24  procedures that were used to purchase the CD's, you would

25  have asked about any agreement that existed to authorize the

Rollage - Direct            69

1  agents to make the purchases, is that correct?

2  A.   I would want to know who had the authority to make that,

3  to make the purchases; number one.  And, number two, was

4  there any type of an agreement that existed between the agent

5  and the county.

6  Q.   And if you had been shown Government Exhibit 2, which is

7  the custodial agreement between the county and Ameriserve,

8  would that have caused you any reason to want to send your

9  confirmation to Mr. Rhoades rather than to Ameriserve?

10  A.   No.

11  Q.   Mr. Rollage, in your opinion, if the auditing firms at

12  issue in this case, the auditing firm for the county and for

13  the school district, had followed generally accepted auditing

14  standards, do you believe they would have sent confirmations

15  to Ameriserve Bank?

16  A.  I believe they would have.

17  Q.  And if Ameriserve Bank would have sent back a letter

18  saying we do not have any assets, we don't have any CD's or

19  any other type of assets on behalf of either the county or

20  the school district, as an auditor would you then report that

21  to either the school district or the county?

22  A.  I would.

23      MR. PATTON:  Those, my questions, Your Honor.

24      THE COURT:  Mr. Piccinini.

25      MR. PICCININI:   Thank you, Your Honor.


                Rollage - Cross              70


1               CROSS-EXAMINATION

2  BY MR. PICCININI:

3  Q.  Mr. Rollage, how do you know that there is not a fox in

4  Ameriserve when you are conducting an audit?

5  A.  You don't.  You design your audit tests around your

6  understanding of the control environment.

7  Q.  And you would agree with me that you don't necessarily

8  know if there is a dishonest person on the other end of those

9  confirmation documents, do you?

10  A.  Well, the first thing you would do would be to make sure

11  you are sending the confirmation to the right person.

12  Q.  But, he is the right person according to the information

13  that has been provided to you by your client.

14  A.  Not if my client has told me that that person is the

15  agent.  And if, in fact, on the face of the document that

16  they give me tells me that the securities are being held by a

17  financial institution, that confirmation is sent to the wrong

18  person.

19  Q.  But, you say that the first thing that one should do in

20  conducting an audit is to gain an understanding of the

21  control environment, is that correct?

22  A.  Correct.

23  Q.  And you would agree with me that to gain an

24  understanding of the control environment, you wouldn't just

25  pull together documents that existed and read them on your

Rollage - Cross        71

1  own, would you?

2  A.  That would be one of several things that I would do.

3  Q.  But, in this particular case, your opinion is based upon

4  the documents that have been provided to you, is that

5  correct?

6  A.  That is correct.

7  Q.  And as you indicated, you never had the opportunity to

8  assess the control environment in Northwestern School

9  District or Venango County, did you?

10  A.  I did not.

11  Q.  You never had the opportunity to sit down with the

12  county treasurer or with other officials within the county

13  solicitor's office or with the county commissioners to talk

14  with them about their accounting and their control

15  environment there at the county?

16  A.  I did not.

17  Q.  Likewise, you never went to the finance director of the

18  Northwestern School District and you never sat down with him

19  and discussed with him the documentation that they had and

20  their understanding of their relationship with Mr. Rhoades,

21  did you?

22  A.  I did not.

23  Q.  But, you would agree with, me, however that in

24  conducting an audit, in order to assess an understanding of

25  the control environment, an auditor, which you weren't hired

Rollage - Cross              72

1  to do that here in this case, but an auditor would sit down

2  with those folks and talk with them?

3  A.  Yes.

4  Q.  But, in your opinion here today, you lack an

5  understanding from conversations with the people who were the

6  victims in this case, you lack an understanding of their

7  relationship with Mr. Rhoades since 1997, isn't that true?

8  A.  That is true.  However, I think that in my reading of

9  the financial statements that were issued, they say that they

10  were issued in accordance with generally accepted auditing

11  and government standards.  And that so I, as an auditor, that

12  means something to me in terms of what they did.

13       I didn't do that, but it means something to me as

14  to what they did.

15  Q.  The documents mean something to you as to what they did?

16  A.  Yes.

17  Q.  Isn't it also important to you as an auditor -- let's

18  say you were hired to conduct an audit.

19      Wouldn't you sit down with the folks and talk with

20  them about who it is that they trusted their money with to

21  invest?

22  A.  That would be part of what I would do.  But, I would

23  hope it would only be the surface of what I would do.

24  Q.  In the course of your going through your background, you

25  talked about the fact that primarily you conduct audits in

Rollage - Cross            73

1  the construction services field in the construction industry?

2  A.  Construction industry.

3  Q.  And you talked today about generally accepted auditing

4  procedures.

5      Have you ever conducted an audit of a government

6  agency or a school district, for that matter?

7  A.  Not a school district.  But, my firm does a great deal

8  of work in the government industry.  And I have -- I am not

9  the primary partner on it, but some of our continuing

10  education and firm meetings address those subjects.

11  Q.  In addition to generally accepted auditing procedures,

12    there are also government auditing standards, as well?

13    A.   That is correct.

14    Q.   And in some respects, the government auditing standards

15    differ from generally accepted auditing standards because

16    they are more specific as to government entities?

17    A.   That is correct.

18    Q.   In this case, counsel asked you whether you reviewed the

19    audit and you responded that you reviewed the financial

20    statement, you never reviewed --

21    A.   I'm sorry?

22    Q.   I am sorry.  I asked whether you did.  You said you

23    analyzed the financial statements?

24    A.   That is correct.

25    Q.   Now, Mr. Rollage, what if the bottom of the confirmation

                    Rollage - Cross                74

1    documents that the county and Northwestern School District

2    received from Mr. Rhoades didn't say anything about the

3    Ameriserve, that when you assessed the control environment of

4    these entities they said our guy is Gary Rhoades, I am the

5    treasurer, and the previous treasurer and the treasurers that

6  I am aware of, have always used Gary Rhoades as our

7  investment guy.  He is the guy we trust.

8       Same thing with the school district.  We invest

9  with Gary Rhoades and I sent confirmation documents, and at

10  the bottom of it, it says nothing about Ameriserve.

11       Is your testimony that you would not send

12  confirmation documents to the county and the school

13  district's guy who invested their funds?

14  A.  I need to know -- I would ask by inquiry, and by inquiry

15  would ask, who holds the funds?  Where are they being held?

16       If I was told by the county and the school district

17  that they were being held by Mr. Rhoades, then I would

18  confirm with Mr. Rhoades.

19  Q.  But --

20  A.  I would also -- let me continue, please.

21  Q.  I am sorry.  Go ahead.

22  A.  I would also ask them if any documentation existed as to

23  their arrangement with Mr. Rhoades.  And if they reported

24  that there was none, then I would have to rely on their

25  verbal representations.

Rollage - Cross       75

1          If, in fact, there was -- they confirmed that there

2    was and they gave it to me, I would review that.

3    Q.   And what you just said, that you would have to rely on

4    their verbal representation in the auditing field, these are

5    not detailed audits of each and every account that exists

6    with the audited entity, are they?

7    A.   They are not.  But, the control environment is not to be

8    taken lightly in an audit.  It is the absolute foundation

9    under which the auditing procedures are designed and it is

10   not -- and if it is not approached with care and if it's not

11   approached with the professional skepticism that an auditor

12   has to have, then the audit is built on a shakey foundation.

13   Q.   But, you didn't do that in this case?  You didn't -- in

14   order to render your opinion here today, you didn't assess

15   the control conditions in this case?

16   A.   I was not engaged to do that.

17   Q.   And you weren't?

18   A.   Correct.

19   Q.   I am not saying that you should have and you didn't.

20   You didn't because that wasn't your job here for today, is

21   that correct?

22  A.  That is correct.

23  Q.  And you had the opportunity to talk to the accountants

24  who actually would have been required to assess the control

25  environment.  You didn't talk with them?

Rollage - Cross          76

1  A.  I haven't talked with them, but I have seen, as the

2  government exhibit, as well as the documentation that was

3  provided to me, the auditor's confirmations.  And based on

4  what I saw there, that indicated -- my professional

5  skepticism was raised to say -- to conclude that I would have

6  done something differently.

7  Q.  But, you never had the benefit to actually sit down and

8  conduct the control assessment yourself?

9  A.  I did not.

10  Q.  In addition, you made the comment that sending a

11  confirmation to Mr. Rhoades would be like sending a fox in to

12  count the hens in the hen house.

13        But, don't you agree with me that audits, just like

14  when you go to your accountant, the strength of what they do

15  is, doesn't go in assuming that everybody is a liar, do they?

16  A.  No.  But, I believe that every auditor -- and I have

17  used this term several times today -- every auditor is told

18  that they must approach the audit with professional

19  skepticism, and by that, I've got the procedures that I have

20  designed, and I have got -- I've got to design those

21  procedures to gain reasonable assurance that I'm going to

22  detect a misstatement of an assertion if it exists.  That is

23  a fact.

24  Q.  You, as an individual conducting an audit, it's

25  certainly not your testimony that you are not susceptible to

Rollage - Cross              77

1  being duped by a professional who is engaged in lying for

2  several years?  You are not above that, are you?

3  A.  I am not testifying to that, no.

4  Q.  And with regard to your fox in the hen house example,

5  what if the fox is sufficiently disguised and you can't tell

6  what -- if he is a person who appears to be a trusted

7  financial advisor, he doesn't appear to the victims and he

8  doesn't appear to the auditor to be a fox, to be a liar, what

9  if he doesn't appear that way and he successfully dupes them

10  and you send your confirmation documents to him and you are

11  successfully duped as well?  That can happen, can it not?

12  A.   If I would have sent it to the right person, I wouldn't

13  have been able to prevent the fraud, but I would have been

14  able to detect it.

15  Q.   And your assessment of who the right person is is by

16  conducting this assessment of the control procedures in

17  determining who is the person that's in the position that I

18  should be able to go to to verify these investments?

19  A.   Absolutely not.  It's the person who is holding the

20  investment.  Who is holding the investment is the fundamental

21  question.  Where is it being held?

22         And in the auditing field, if it's inventory at the

23  end of the year, I go out and I count it.  If it's money on

24  deposit at a bank, I send a bank confirmation to the bank.

25  If it's hard assets that exist in the parking lot, I may go

                    Rollage - Cross              78


1  out and kick the tires.

2         Again, my responsibility is to verify the existence

3  of the material assets if I determine that it's material.

4  Q.   And in this case, for some reason which isn't known to

5  you because you weren't part of the auditing team, for some

6   reason, the location, the place where these confirmation

7   documents went is to this man seated in the courtroom?  For

8   some reason, that happened?

9   A.   That's correct.

10  Q.   Have you been engaged by the law firm of Kirkpatrick &

11  Lockhart to act as an accountant for them?

12  A.   No, I don't believe so.

13  Q.   Have you ever had a relationship with the law firm,

14  Kirkpatrick & Lockhart, in Pittsburgh?

15  A.   No.  They have been a defendant in cases where I have

16  been an expert, but I have not had a relationship with them.

17  Q.   I am not asking whether you audited for them.

18        I am asking you whether or not you have ever been

19  hired, employed or consulted with them in any fashion on any

20  case?

21  A.   No.  Again, other than a case where they have been a

22  party in a case where I have been an expert witness.

23        MR. PICCININI:  Okay.  Thank you.  That is all I

24  have, Judge.

25              REDIRECT EXAMINATION

                Rollage - Redirect          79

file:///A|/RHOADES.TXT

1  BY MR. PATTON:

2  Q.  Mr. Rollage, you heard the testimony from Mr. Smith

3  today that the officials at the county and that the officials

4  at the school district believed the CD's they had purchased

5  through Mr. Rhoades were on deposit in Ameriserve, is that

6  correct?

7  A.  That's correct.

8  Q.  If you were doing an audit for either the school

9  district or the county and they told you just that, that we

10  have used Gary Rhoades to buy these CD's, we think Gary is a

11  great guy, we have used him for a long time, he bought the

12  CD's for us and he has them, he then placed them at

13  Ameriserve Bank and that's where they physically are being

14  held, who do you send the confirmation to?

15  A.  Unquestionably, Ameriserve Bank.

16  Q.  Is part of your audit, as you have said when you are

17  dealing with a financial statement audit, to determine

18  whether or not the statements that are on the financial

19  statement are somehow wrong?

20  A.  Well, my test -- the statements are not my statements.

21  They are the client's statements.  So, in this case, either

22   the county or the school district made assertions to me that

23   these are the assets, the liabilities, the income, the

24   expense that they have and they have accounted for them in a

25   certain way.


                    Rollage - Redirect              80


1        And as I testified previously, after my -- after

2    gaining an understanding of the control environment, we will

3    tailor our audit program in a way that will give us

4    reasonable assurance that those -- that there are not any

5    material misstatements in those assertions that, when

6    aggregated together, are going to lead to a material

7    misstatement on the financial statement.

8    Q.   Now, is it accurate to say that the auditor does have to

9    rely, to some extent, in learning the control environment

10   from information provided by the management of the people

11   being invested?

12   A.   Absolutely.

13   Q.   But, does an auditor allow the management of the entity

14   being audited to tell the auditor where the auditor has to go

15   to do their confirmations?

16   A.   Absolutely not.

17   Q.   Who is responsible for making the determination of where

18   the proper verification has to come from?

19   A.   The auditor.

20   Q.   Is that part of the inherent -- inherently what comes

21   with being hired by an entity to audit their financial

22   statements?

23   A.   Well, once again, one of the main objectives is to

24   determine the existence of the asset; in the particular case,

25   the CD.

81

1          So, the auditor is going to send his confirmation

2    to the person or institution that then is holding those CD's.

3    Q.   So, if the -- for example, if Venango County had said,

4    look, the CD's are on file with Ameriserve but we purchased

5    them through Gary Rhoades so you should go to Gary Rhoades

6    and get your confirmation from Gary Rhoades, would you then

7    say, okay, fine, I will then go and confirm that with Gary

8    Rhoades?

9    A.   No.

10         THE COURT:  This is getting repetitious,

11   Mr. Patton.

12   Q.   Is part of not getting duped as an auditor going to the

13   right place to confirm the existence of assets?

14   A.   Part of not getting duped as an auditor is, again, to

15   understand the environment that you are working in.  And if

16   you have a solid understanding of that environment, you

17   should have reasonable assurance that you are not going to

18   get duped.

19        MR. PATTON:  Those are my questions.

20        MR. PICCININI:  Nothing in response, Your Honor.

21        THE COURT:  Thank you, sir.

22        THE WITNESS:  Thank you.

23   (The witness was excused.)

24        THE COURT:  Anything further, Mr. Patton?

25        MR. PATTON:  We have no further evidence, Your

82

1   Honor.

2        THE COURT:  Do you want to give me your argument?

3        MR. PATTON:  Yes, please.  And, Your Honor, can

4   Mr. Rhoades be excused?

5          THE COURT:  Sure; not Mr. Rhoades.  Mr. Rollage.

6          MR. PATTON:  I'm sorry if I mispoke.

7     (The witness was excused.)

8          MR. PATTON:  To clarify one thing on this argument.

9     In the government's response to our argument on the abuse of

10    position of trust issue, they say that Mr. Rhoades is trying

11    to avoid responsibility for the crime and blame the victims

12    for the crime and that's not accurate.

13          No one here disputes that the crimes have been

14    committed.  Mr. Rhoades has pled guilty to those crimes and

15    the question, when it comes to abuse of position of trust, is

16    not, did Mr. Rhoades commit the crimes?  He, of course, did.

17          The question is:  Did he abuse a position of trust?

18    Which is a legal conclusion that you have to make based on

19    the facts in the case.  And so it isn't an attempt to try and

20    avoid any kind of responsibility for the actions.  It's

21    simply a legal question of, do these facts meet the legal

22    requirement of abuse of position of trust?

23          And the Third Circuit, as was set out in United

24    States versus Pardo, 25 F.3d 1187, the Third Circuit

25    established a three-part test for deciding whether someone

1   abuses a position of trust, and we have set it out.  And,

2   Your Honor, I am sure, is familiar with it.

3        And where we would focus our argument on is mainly

4   that the first part of that test is whether Mr. Rhoades'

5   position allowed him to commit a difficult-to-detect wrong.

6   And I believe the Pardo case is very instructive to how the

7   abuse of position of trust enhancement applies in this case.

8        In Pardo, the defendant went to a bank to try and

9   open a bogus checking account so he could then do a check

10  kiting scheme.  Well, the defendant had done just that to the

11  same bank on a prior occasion.  The bank had not chosen to

12  file criminal charges, but they had entered Mr. Pardo's name

13  into their security system so that if he again tried to open

14  an account there, he would not be allowed to open an account.

15       So, the bank had in place a system of checks that,

16  had those checks worked properly, would have prevented

17  Mr. Pardo from opening an account and would have easily

18  detected his crime.

19       Those procedures weren't used because the manager

20  of the branch that Mr. Pardo went to was a friend of

21  Mr. Pardo's wife and so she didn't follow through the

22  procedures the bank had established.  And because those

23  procedures weren't used, the offense was able to be

24  committed.  But, the Third Circuit said that Mr. Pardo's

25  position as a friend of the bank manager did not give him the

84

1  ability to commit a difficult-to-detect wrong.  There would

2  have been nothing difficult to protect had the routine

3  precautions been taken.  And, at most, Pardo's position as a

4  friend allowed him the opportunity to commit an

5  easily-detectible wrong.

6        Well, in this case, the county and the school

7  district set up procedures that they believed were a check

8  against Mr. Rhoades and that protected them from this very

9  crime.

10        Now, those procedures weren't followed, weren't

11  followed correctly, so the offense was able to occur.  But,

12  it doesn't change the fact that had the precautions been

13  performed properly, if the procedures had been performed

14  properly, this would have been a very easily detectible

15  offense.

16     And oddly enough, Your Honor, you don't have to

17   take my word for that, at least with regard to the county,

18   because the county has said just that in the civil complaint

19   it has filed against both Ameriserve Bank and against their

20   auditors McMahon, O'Polka, Guelcher and Associates.

21     In the county's civil complaint itself, it states

22   that -- this is paragraph 91 on page seventeen.  It says:

23     As the custodian of the county's public funds,

24   Ameriserve had a fiduciary duty to the county to maintain and

25   protect the funds in the custodial account and not to permit

85

1   third parties to access county's funds without county

2   authorization.  The county trusted Ameriserve to safeguard

3   its money and the county placed its confidence in Ameriserve

4   to do so.

5     Now, that wasn't done.  Now, you can argue as to

6   whether or not Ameriserve's actions violated the law or not,

7   but there can be no doubt that the county took the position

8   of, we have, by using the custodial agreement and having the

9   bank be the custodian where the CD's were actually going to

10  be filed, that gives us a level of protection because the

11  CD's are not going to be held by Mr. Rhoades, they are going

12  to be held by a bank in the bank's trust department.

13       They also then in their complaint in the breach of

14  fiduciary count against McMahon, O'Polka claim that, you

15  know, that they relied on McMahon, O'Polka to conduct a

16  proper audit and that the firm had a duty to detect any

17  material irregularities in the county's financial records and

18  the county trusted McMahon, O'Polka to perform the proper

19  audit and the county placed its confidence in the firm to do

20  so.

21       The point of the abuse of position of trust

22  enhancement is to prevent an insider from abusing that

23  position to commit this crime.  And what the application

24  notes talk about is that an insider is someone that the

25  victim trusts so much that they really don't check up on the

86

1  insider, they don't take precautions to prevent themselves

2  from being defrauded because they view the defendant as an

3  insider and someone they don't have to check up on.  The

4  county set up checks against Mr. Rhoades.

5      Now, even though those procedures failed doesn't

6  change the fact that the county did not say Mr. Rhoades is a

7  great guy, we trust him, we are not going to have his work

8  reviewed at all.  They didn't do that.

9      Had the audits been done in accordance with

10  generally accepted auditing standards, verifications would

11  have been sent to Ameriserve and they would have said we

12  don't have any CD's.  This would have been detected very

13  easily.

14      The government has said, well, with regard to

15  Mr. Rollage, well, you didn't talk to people from the county

16  or school district, you don't know what they told the

17  auditors.  But, we know that Mr. Smith said he talked with

18  the county and the school district people and their belief

19  was the items were on the deposit in Ameriserve Bank.  And

20  every statement that Mr. Rhoades sent to the county and to

21  the school district said that the assets were being held by

22  Ameriserve Bank.

23      Now, it is not improper for Your Honor to then

24  reach the conclusion that, of course, the auditors were told

25  that the assets were being held in account at Ameriserve

1  Bank.  And, in fact, we know that the county's auditors knew

2  that because they received the statements from Mr. Rhoades

3  and they attached them to the confirmation notice they sent

4  out, and those statements from Mr. Rhoades specifically

5  stated the assets were on account at Ameriserve.

6       Now, in the government's response, they also cited

7  to United States versus Iannone, I-a-n-n-o-n-e, which is

8  184 F.3d 214.

9       Now, at one point in that opinion, the majority

10  opinion does say that, that in determining whether there was

11  a difficult-to-detect wrong, the focus is not on the victim.

12  The focus is exclusively on the defendant.

13       But, I would submit to you that that is dicta and,

14  in fact, is contrary to what the majority opinion itself did.

15  In affirming the abuse of position of trust, the majority

16  looked at the scheme the defendant in that case had come up

17  with and looked at the fact that because that person was the

18  defendant was the only source of information regarding the

19  investments that the defendants -- the defendants -- the

20  victims couldn't go anywhere else to get any kind of

21  confirmation.  They were totally dependent on the defendant.

22           Well, in that case, that's not the case here.  And

23  also, as Judge Becker points out in his concurrences, that

24  it's simply you cannot say, when doing abuse of position of

25  trust analysis, that you don't look at the conduct of the

88

1  victim.

2           And as Judge Becker points out, if that were the

3  case, Pardo could not have been decided the way it was

4  because the way they looked at Pardo was looking at the

5  victims, the bank and saying, look, the bank had procedures

6  set up to protect them against this fraud.  And since the

7  bank had these systems set up and they didn't place trust in

8  Pardo, they had systems in place to protect themselves from

9  Pardo, those systems just didn't work or were circumvented.

10          And so in the case that establishes the test for

11  abuse of position of trust, the Third Circuit, itself, looked

12  at the conduct of the victim, which only makes sense, because

13  when you are trying to decide whether the person has a

14  position of, abuse of position of trust, you have to look at

15  how the victim viewed the defendant and what steps, if any,

16  the victims took to protect themselves from being defrauded.

17  Because as the commentary to the abuse of position of trust

18  enhancement say is that part of the basis for this

19  enhancement is that if the victim considers the person an

20  insider, the victim will not take steps to check up on the

21  defendant.

22        So, even the commentary to 3B1.3 says you have to

23  have some focus on the victim.  And so the statements in

24  Iannone that says you don't at all look to the position and

25  the victim's action, I would submit is dicta that was not

89

1  crucial to the actual holding and is contrary to Pardo and,

2  in fact, basically overruled Pardo, which the panel in

3  Iannone can't do.

4        And so what I would just ask the Court to keep in

5  mind is, we are not saying Mr. Rhoades didn't do this.  The

6  question is, factually, did he occupy a position of trust?

7  Obviously, he abused trust that was placed in him.  You can't

8  have a fraud without the victim trusting the defendant enough

9  to give the victims' money to the defendant and then the

10    defendant take it.

11         So, there is a form of abuse of trust in any fraud.

12    You can't have fraud without it, but that is not the question

13    here.  It isn't, did the county trust Mr. Rhoades to invest

14    the money properly?  Of course they did.  If they didn't,

15    they never would have given him the money.  The offense would

16    not have happened.

17         The question is:  Was Mr. Rhoades in a position as

18    an insider that prevented the county from checking up on him

19    and having any supervision?  And that's just not the case

20    under the facts here.

21         THE COURT:  Thank you.  Mr. Piccinini.

22         MR. PICCININI:  Thank you, Your Honor.

23         In this case, Mr. Rhoades' position of trust isn't

24    established for the Court by these documents that we put into

25    evidence, the documents, claims that he's an agent for the

90

1    investor holding monies with a custodian.  That doesn't

2    establish his position.

3         He established his position over a long term, since

4   1997 and before, established himself in a position of trust

5   as the trust and investment advisor for the county and school

6   district.  You can't disregard the history that this man

7   established prior to accepting the position into which he

8   was.

9          In 1997, these folks, who were the victims, are

10  getting letters from Mellon Bank, of all places, confirming

11  that Mr. Rhoades, this vice president of this trust company,

12  is the guy to turn to for their four and a half million

13  dollar certificate of deposit investment.  He is the guy.

14         They established a track history, successfully

15  invest.  Mr. Rhoades continues to persuade them that I am the

16  guy.  And then what does he do during the period of our

17  fraud?  He hangs out his own shingle.  He holds the position

18  of trust as the investment advisor for the county and the

19  school district, and all these documents did for Mr. Rhoades

20  was to legitimize his position.

21         I understand the civil suit, you know, we come into

22  a criminal sentencing, we have an attachment to the response,

23  a civil litigation, an entire civil complaint which,

24  concededly by every one, has a different focus than our focus

25  here today.

1          And our focus here today is to whether to sentence

2     this man more severely because of the position of trust that

3     he established for himself, not who is going to have to pay

4     money as a result.  Because as we showed you from the chart,

5     most of the $975,000 that this man stole is gone.  But, that

6     is not our focus today.

7          We are concerned about whether this man held a

8     position of trust.  And if you actually look at the Pardo

9     case and Iannone, it is not just as counsel indicated.  Pardo

10     makes it very clear that what we are looking at is the

11     primary trait to distinguish a person in a position of trust

12     from one who is not is the extent to which the position

13     provides the freedom to commit a difficult-to-detect fraud.

14          This man had all the freedom.  By all the documents

15     that he established with the bank and by all of his long

16     track history with these investors, he established for

17     himself a position of trust.

18          The position that he held of trust isn't a position

19     of trust with the bank.  It's not a position of trust with

20  the auditors.  We look at his victims.  Did he hold a

21  position of trust with these victims?  And he did.

22         We spent most of the day talking about auditing

23  principles.  And I asked Mr. Rollage one question at the end,

24  that can't you tell, from your review of this case, that, for

25  some reason, these victims and these auditors sent

92

1  confirmation documents to this man.  Yes.  He said he

2  wouldn't have done it himself but, yes, this is the reason

3  that that happened.

4         And the answer to that question is that because

5  this man held a position of trust and he abused it.  He duped

6  a whole lot of people.  We focus on the victim, not on

7  whether they exercised due diligence on whether he executed

8  the fraud.  Why isn't it that this fraud wasn't detected

9  sooner?  Why didn't they discover that these were phony

10  investments because we could have figured that out?

11         The answer to that question is the same one,

12  because this man held a position of trust and abused it,

13  several years of that, and I believe that the two-level

14  enhancement should apply.

15          THE COURT:  Thanks.  I think, no question in my

16   mind that Mr. Rhoades did hold a position of trust.  The

17   Pardo -- Well, first of all, the guidelines give a pretty

18   good definition.

19          Public or private -- and I am referring to Section

20   3B1.3 of the guidelines.  Public or private trust refers to a

21   position of public or private trust characterized by

22   professional or managerial discretion.  Certainly he had

23   that.

24          Substantial discretionary judgment.  He had that.

25   That is ordinarily given considerable deference.  Persons

93

1    holding such positions ordinarily are subject to

2    significantly less supervision than employees whose

3    responsibilities are primarily nondiscretionary in nature.

4           And certainly Mr. Rollage was a good witness and

5    probably or might be in the lawsuit if -- that Venango County

6    has, which I think it does include the accountants, but

7    certainly here we don't look at the failure of the

8    accountants to do what Mr. Rollage says they should have

9   done.  We look at the position that Mr. Rhoades held.

10          The Pardo case gives us three prongs to consider.

11          First, the Court looks to whether the position

12  allows the defendant to commit a difficult to detect -- the,

13  quote, difficult-to-detect wrong.  And I think, while

14  Mr. Rollage would contend that this wrong was easy to detect,

15  the history of the case tells us that it certainly was not.

16          Secondly, we are told to consider the degree of

17  authority which the position vests in the defendant vis-a-vis

18  the object of the wrongful act.  And he certainly had that.

19          And, finally, we look to whether there has been

20  reliance on the integrity of the person occupying the

21  position.  And there certainly was that.

22          The citation for Pardo is United States against

23  Pardo, 25 F.3d 1187, at the Third Circuit, 1994.  And the

24  Iannone case said the first part of the prong is that the

25  difficult-to-detect wrong, said that the focus is on the

94

1   defendant, not his victims, and requires the Court to

2   determine whether the position the defendant occupied allowed

3   him to commit a difficult-to-detect wrong.

4          And so we, as I say, we conclude there is no doubt

5     in the Court's mind here that Mr. Rhoades did occupy a

6     position of trust and that he violated that trust.

7          So, there are one other minor objections to the

8     presentence report regarding some family names and I think

9     the Probation Officer has agreed to note that change in

10     his -- or amendment to his presentence report.

11          So, we find here that the offense level is

12     twenty-one.  The criminal history category is Roman numeral

13     I.  The applicable guideline range -- I guess we should say

14     the advisory guideline range these days -- is 37 to 46 months

15     of imprisonment, supervised release of two to three years on

16     each of Counts 6, 8 and 24, a fine in the range of 7,500 to

17     $75,000, restitution in the amount of $1,698,000, and a

18     special assessment of $300.00.

19          At this time, Mr. Patton, is there anything you

20     would wish to say with respect to the sentence?

21          MR. PATTON:  Your Honor, as we have set out in

22     the -- our position with respect to sentencing factors,

23     Mr. Rhoades has accepted responsibility for his offense.  And

24     Your Honor is going to sentence him to a term of imprisonment

25   today so he is going to be punished in that way.  And when he

95

1   comes out of his term of imprisonment, he is not going to be

2   able to go back to the profession that, for a good portion of

3   his life, he earned an honest living on.

4        Now, when he got in trouble, in the late, you know,

5   '90's and 2000, the legitimate investing that he was doing

6   went bad so he is not going to be able to support himself

7   that way.  He has no money, no assets, and with his age, his

8   employment opportunities are going to be limited, especially

9   when he is going to have a felony conviction, and he

10   certainly isn't going to be able to get any job that involves

11   him handling sums of money.  And so he is going to pay for

12   this offense for the rest of his life.

13        And when you are deciding on a term of imprisonment

14   in this case and trying to decide what is sufficient but not

15   greater than necessary to comply with the sentencing purposes

16   laid out in 18 U.S. Code, Section 3553(a)(2), I think you can

17   keep that in mind.

18        As far as to reflect the seriousness of the offense

19   and to promote respect to the law and to provide just

20  punishment for the offense, the term of imprisonment is going

21  to do that.

22      To afford adequate deterrence to criminal conduct,

23  I would submit that there is not a high degree of risk that

24  Mr. Rhoades is going to re-offend, he is not going to be in a

25  position to really commit an offense like this in the future.

96

1  And sending Mr. Rhoades or having -- sentencing him to a term

2  of imprisonment will deter other people that are considering

3  engaging in this type of fraudulent conduct from engaging in

4  that conduct.

5      And while Mr. Rhoades doesn't -- there aren't

6  really needed educational or vocational training or medical

7  care that he particularly needs in this case, once he is

8  released from his term of imprisonment, he will find a job

9  and he will make payments towards restitution.  And the

10  quicker he is out, the quicker he can make those payments.

11      And Mr. Rhoades would like to make a statement to

12  Your Honor.

13      THE COURT:  Mr. Rhoades.

14          THE DEFENDANT:  Thank you, Your Honor.  I want to

15    take this opportunity to publicly state that I know how

16    terribly wrong my actions have been.  I humbly apologize to

17    all the citizens of the County of Venango and the

18    Northwestern School District for the financial loss I caused.

19          In addition, I want to apologize to the officials

20    of the county and the school district and others for the

21    financial, psychological and emotional damage I caused you

22    personally.  It is my sincere hope that one day I will be

23    able to pay at least the financial debt that I owe to all of

24    you.

25          THE COURT:  Thank you.  Mr. Piccinini.


97


1          MR. PICCININI:  Thank you, Your Honor.

2          On behalf of the victims in this case who, both

3    Susan Smith and Paul Steger from the Northwestern School

4    District, and victims that have shown a significant interest

5    in what happens here today, and for good reason.  And I think

6    if you -- one of the things that is not considered in the

7    guidelines is the nature of our victims.

8          And I think it is important, as you decide where to

9  sentence the defendant here today, to take in the seriousness

10  by which a sentence for someone who seeks out and targets

11  victims such as these should be sentenced.

12       And, first of all, with regard to the county, and

13  we are talking about Venango County, Pennsylvania, likely a

14  financially-strapped county that has no room for the loss of

15  funds to this degree -- not that any county would -- but, in

16  particular, Venango County.  And if you look at the impact it

17  has on the citizens of Venango County in the victim impact

18  statements, they talk about directly because of what this man

19  did, they have had to cancel future plans and goals for which

20  the stolen funds were earmarked.

21       They are required to divert funds to other

22  locations during current times of decreasing revenues and

23  increasing operational costs.  They had to allocate

24  additional county funds from an already-tight budget to deal

25  with the aftermath of what Mr. Rhoades did.

98

1       And then, just from a personal standpoint for

2  members of the county, there are a lot of good people there,

3    Judge, who have been pulled down because of what Mr. Rhoades

4    did far beyond the theft of the money.  They have all been

5    scrutinized and criticized and critiqued for what they should

6    have done.

7         And in the end, our focus today is on this man

8    today.  I am worried about who should be held criminally

9    responsible and how they should be punished for the things

10   that they did.  It's taken down the reputation of a lot of

11   good people that work down there; not just taking money.  Any

12   flickers of hope that the county has of pursuing aggressive

13   idea and goals for improving Venango County are on hold

14   because this amount of money for them is significant.

15        But, if this victim isn't bad enough, you look at

16   the Northwestern School District here in Albion,

17   Pennsylvania, and what was the money earmarked for that this

18   man stole?

19        First of all, what they were doing was taking

20   interest generated from the investment of these funds

21   earmarked for improvement of facilities and programs for

22   students.  They don't have the cash for that directly because

23   of what this man did.  And there are other projects for --

24   their technology and agricultural program out in Albion,

25  Pennsylvania, that have to be cancelled or postponed because

99

1  of what he did.

2       Then you look at the taxpayers whose money it was

3  that he stole and how, in times of the desires not for tax

4  increases, and everything else, you got a defendant that's

5  stealing the money from them.

6       And then you look, Judge, at the chart that we

7  provided to you look at what the man did with the money.

8  There is nothing to show for it.  $975,000 over a short

9  period of time.  Judge, it is gone.  Nothing to show for it.

10       And, you know, Judge, as Mr. Patton says, that this

11  sentence in this range would be sufficient to show others

12  that are inclined to commit this behavior not to do so, but

13  the Court needs to wonder about that.

14       There are people in this community who would say

15  stealing a couple million dollars and getting a sentence of

16  37 to 46 months doesn't sound so bad a thing.  Those are

17  people that never spent a day in jail obviously and are not

18  going to be subject to the sensitivities.

19          But, the guidelines for this man, 37 to 46 months,

20   having stolen almost two million dollars from these victims,

21   look at where, within that range to sentence him to make it

22   appear to others who were inclined to do the same thing,

23   would be severe enough from them doing it themselves.

24          That is all I have.  Thank you.

25          THE COURT:  Well, I think it's been well said by

                                100

1   everyone here as to what the impact of this activity has been

2   with respect to Venango County and the Northwestern School

3   District.  I am not going to belabor the point any further.

4          Mr. Patton, is there any reason sentence should not

5   be imposed at this time?

6          MR. PATTON:  No.

7          THE COURT:  Mr. Rhoades?

8          THE DEFENDANT:  No, sir.

9          THE COURT:  Mr. Piccinini?

10          MR. PICCININI:  No, Your Honor.

11          THE COURT:  After consulting the Sentencing

12   Guidelines, it is the judgment of the Court that the

13   defendant, Gary Dean Rhoades, is hereby committed to the

14  custody of the Bureau of Prisons to be imprisoned for a term

15  of 46 months on each of Counts 6, 8 and 24, to be served

16  concurrently.

17      It is further ordered that the defendant shall make

18  restitution to the following victims in the following

19  amounts:

20      Venango County, Pennsylvania, $1,500,000.

21      Northwestern School District, $198,000.

22      Any payment made that is not payment in full shall

23  be divided proportionately among the persons named.  The

24  defendant shall make restitution payments from any wages he

25  may earn in prison in accordance with the Bureau of Prison's

101

1  Financial Responsibility Program through which 50 percent of

2  the defendant's salary shall be applied to restitution.  Any

3  restitution balance that is not paid in full at the time that

4  the defendant is released from prison shall become a

5  condition of supervision.

6      The Court finds that the defendant does not have

7  the ability to pay interest on the restitution and,

8    therefore, we will waive the interest requirement in this

9    case.

10          The defendant shall notify the United States

11   Attorney for this district within thirty days of any change

12   of mailing or residence address that occurs while any portion

13   of the restitution remains unpaid.

14          Upon release from imprisonment, the defendant shall

15   be placed on supervised release for a term of three years.

16   This term consists of three years on each of Counts 6, 8 and

17   24.  All such terms to run concurrently.

18          Within seventy-two hours of release from the

19   custody of the Bureau of Prisons, the defendant shall report

20   in person to the Probation Office in the district to which he

21   is released.

22          While on supervised release, the defendant shall

23   not commit another federal, state or local crime, he shall

24   comply with the standard conditions that have been

25   recommended by the Sentencing Commission and adopted by this

102

1    Court, and shall also comply with the following additional

2    conditions:

3       The defendant shall not illegally possess a

4   controlled substance.

5       The defendant shall not possess a firearm or

6   destructive device.

7       The defendant shall pay any remaining restitution

8   balance through monthly installments of not less than ten

9   percent of his gross monthly income.

10      The defendant shall provide the Probation Officer

11   with access to any requested financial information.

12      The defendant shall not incur any new credit

13   charges or open additional lines of credit without the

14   approval of the Probation Officer.

15      The periodic drug testing mandated by the Violent

16   Crime Control and Law Enforcement Act of 1994 is hereby

17   suspended.  The Court finds that this offense is not drug

18   related, and this defendant has no current or past history of

19   substance abuse.

20      It is further ordered that the defendant shall pay

21   to the United States a special assessment of $300.00, which

22   shall be paid to the U.S. District Court Clerk forthwith.

23      The Court finds that the defendant does not have

24   the ability to pay a fine.  The Court will waive the fine in

25   this case.

103

1         We believe that a term of 46 months imprisonment

2   followed by a period of three years of supervised release

3   does adequately address the sentencing objectives of

4   individual and general deterrence and punishment, as well as

5   protection of the community.

6         Mr. Rhoades, you have a right to appeal.  An appeal

7   must be filed within ten days.  You are entitled to a lawyer

8   at every stage of the proceedings.  If you cannot afford an

9   attorney, one will be provided for you without charge.

10        I believe we have some counts to dismiss here,

11   Mr. Piccinini?

12        MR. PICCININI:  Yes, Your Honor.  The remaining

13   counts that --

14        THE COURT:  I think that is one through five, seven

15   and nine -- one through five, seven, and nine through

16   twenty-three, and twenty-five through twenty-nine are

17   dismissed.

18        I assume Mr. Rhoades is a good candidate to

19  self-report to wherever he is assigned by the Bureau of

20  Prisons.

21      And, Mr. Rhoades, if I have your word that you will

22  show up where they tell you to show you, why, I will permit

23  you to remain on bond until such time as you receive your

24  assignment.

25      THE DEFENDANT:  Thank you, Your Honor.


                              104


1       MR. PATTON:  Your Honor, I could, within the next

2  day, talk with Mr. Rhoades about a potential recommendation

3  to the Bureau of Prisons for a facility to be housed.  I need

4  to talk with him some about where different relatives are

5  going to be living.

6       THE COURT:  I will hold off signing the commitment

7  order until such time as I hear from you.

8       MR. PATTON:  Thank you, Your Honor.

9       MR. PICCININI:  Thank you, Your Honor.

10  (Court recessed on Tuesday, June 21, 2005, at 12:15 p.m.)

11

12              * * * * *

13        I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16
                          S\Michael D. Powers
17                          Official Reporter

18

19

20

21

22

23

24

25